# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

> Plaintiff,

v.  Case No. 21-CR-70

DWIGHT CLAYTON, et al.,

> Defendants.

# RECOMMENDATIONS AND ORDER

## 1. Procedural Background

Dwight Clayton and Jeffrey Coleman are charged in a superseding indictment with conspiracy to distribute controlled substances. (ECF No. 72 (Count One).) Clayton is also charged with possession of a firearm in furtherance of a drug trafficking offense (ECF No. 72 (Count Two)), engaging in a prohibited financial transaction (ECF No. 72 (Count Three)), and money laundering (ECF No. 72 (Count Six)).

Currently before the court are Clayton's motions to suppress based on an unlawful arrest (ECF No. 41), an unlawful vehicle stop and search (ECF No. 42), and an unlawful search pursuant to a search warrant (ECF No. 43), as well as Coleman's motions to suppress based on an unlawful stop (ECF No. 29), an unlawful arrest (ECF No. 30), and

an unlawful vehicle search (ECF No. 31). An evidentiary hearing was held before this court on October 18, 2021. The parties then submitted post-hearing briefs. Relevant facts adduced at that hearing are set forth below. At the expense of some duplication, the court's discussion of each motion is preceded by a discussion of those facts relevant to the motion.

The court previously addressed other motions filed by the defendants. (*See* ECF Nos. 54, 55 (addressing ECF Nos. 28, 32, 44); 58, 59 (addressing ECF No. 33).) A motion for the return of property (ECF No. 19) is currently pending before Judge Adelman.

## 2. The Stop and Search of Clayton's Car (ECF No. 42)

### 2.1. Facts

The present investigation began in March of 2020 when DEA Task Force Officer Matthew Cooper was contacted by investigators from the Northern District of Illinois about money laundering occurring in Illinois and Wisconsin. (ECF No. 93 at 63-64.) On March 14, 2020, Wisconsin investigators participated in a transaction in which about $149,000 was delivered by an Illinois suspect to an undercover officer in Wisconsin. (ECF No. 93 at 65.) A delivery of a similar amount of currency between the suspect and the undercover officer occurred about a week later. (ECF No. 93 at 66.)

Following those deliveries, investigators obtained a warrant to track the location of the Illinois suspect's vehicle. (ECF No. 93 at 66-67.) This led to a traffic stop of that vehicle on April 2, 2020, during which law enforcement noticed that a second vehicle

appeared to be traveling with the vehicle of the Illinois suspect. (ECF No. 93 at 67-68.) Investigators tracked both vehicles to a Walgreens on the north side of Milwaukee, where the Illinois suspect got out of his car and into the second vehicle and then traveled to a commercial parking lot located at 5270 West Clinton Avenue in Milwaukee. (ECF No. 93 at 68.) One of the businesses that used this parking lot was S&C Trucking, owned by Clayton. (ECF No. 93 at 69.) After about three minutes the second vehicle left the parking lot and returned to the Walgreens. (ECF No. 93 at 69.) After about 30 minutes at the Walgreens parking lot a third car, a grey Hyundai registered to Clayton, arrived. The Illinois suspect exited the second vehicle and got into the Hyundai, where he sat for about five to ten minutes. (ECF No. 93 at 69.) The Illinois suspect then returned to his vehicle. (ECF No. 93 at 70.)

The grey Hyundai left the Walgreens and was not followed. (ECF No. 93 at 70.) The second car went to a nearby gas station. (ECF No. 93 at 70.) The first car drove around the block, which Cooper characterized as a common counter-surveillance technique, and then returned to the Clinton Avenue parking lot. (ECF No. 93 at 70.) After the first car drove down the dead-end street leading to the Clinton Avenue parking lot, investigators saw both the second and the third vehicles drive toward the parking lot. (ECF No. 93 at 70-71.) About ten minutes later an investigator saw several people standing around the vehicles in the parking lot, and the Illinois suspect seemed to be conducting counter-surveillance. (ECF No. 93 at 71.)

Shortly thereafter the first car left the parking lot, went to the gas station where the second car had stopped, and then returned to the area of the Clinton Avenue parking lot. (ECF No. 93 at 71.) However, instead of parking in the same parking lot, this time the first car parked across the street and the Illinois suspect seemed to again conduct counter-surveillance. (ECF No. 93 at 71.) After about 30 to 60 minutes, the three vehicles left. The first two vehicles went to the same Walgreens at which they had stopped earlier. (ECF No. 93 at 71.) The third vehicle, the grey Hyundai registered to Clayton, first went to a McDonalds and then to a residence at 9736 W. Tower Avenue, where it entered the garage. (ECF No. 93 at 71-72.)

Several months later, on September 10, 2020, Milwaukee Police executed a search warrant at a residence that Clayton owned and reportedly rented to a friend of a friend. (ECF No. 93 at 81-82.) Clayton arrived at the residence while police were still there and provided his address as 9736 W. Tower Avenue. (ECF No. 93 at 82.)

On September 23, 2020, another DEA office contacted Cooper and told him that they had "received a quantity of bulk currency" from Clayton, and Clayton had been driving a Dodge Ram 2500 pickup with Wisconsin registration. (ECF No. 93 at 83.)

In October 2020 the FBI received an online tip that Clayton was involved in money laundering using his trucking business, S&C Trucking. (ECF No. 93 at 84-85.) The tipster, who identified themself and later met with investigators, stated that Clayton had a prior federal drug conviction and that s/he believed a former co-defendant of Clayton's,

4

Christopher Powell, was involved. (ECF No. 93 at 85, 118.) This led Cooper to look into all of the co-defendants in Clayton's prior federal case, resulting in him identifying Coleman for the first time. (ECF No. 93 at 86; *see also United States v. Clayton*, 04-CR-66 (E.D. Wis.).)

On October 20, 2020, 61 kilograms of cocaine were seized by law enforcement in Texas that had been concealed in a pallet wrapped in clear plastic wrap. (ECF No. 93 at 72-73.) That cocaine was intended to be shipped by a commercial shipper to a business located at 1850 North Martin Luther King Drive in Milwaukee. (ECF No. 93 at 73.) Investigators learned that this business was registered to someone named Ronny Thompson. (ECF No. 93 at 74.) A review of Thompson's phone records revealed that he was in frequent contact with Clayton—over 100 contacts in about two months. (ECF No. 93 at 74-75.) Thompson and Clayton were also Facebook friends and identified as business partners in an online article. (ECF No. 93 at 75.)

Investigation discovered that there had been three similar shipments from Texas to the Milwaukee business other than the one that was intercepted. (ECF No. 93 at 77.) After learning that those shipments occurred on August 21, August 28, and September 25 of 2020, Cooper attempted to locate surveillance video that might have recorded the deliveries. (ECF No. 93 at 78.) Cooper found surveillance video for August 21, 2020, that recorded Clayton arriving in a black Dodge Ram 2500 pickup, pulling up to the delivery

truck, and then leaving with a full-sized pallet now loaded in the bed of the truck. (ECF No. 93 at 79.)

On November 3, 2020, Clayton left the home on Tower Avenue and met with an undercover officer, to whom Clayton delivered about $150,000 in currency. (ECF No. 93 at 87.) The next day investigators installed a pole camera to monitor the parking lot on Clinton Avenue. (ECF No. 93 at 88.) Investigators also obtained warrants to track Clayton's pickup truck, a Kia Optima that Clayton was known to drive, and his phone. (ECF No. 93 at 89.)

On November 24, 2020, Cooper noticed that Clayton's vehicle and phone were on the south side of Milwaukee, which was unusual; Clayton generally remained on the north side. (ECF No. 93 at 90.) Cooper located Clayton's vehicle in the parking lot of a bank in Cudahy. (ECF No. 93 at 90.) Clayton was in the driver's seat, and in the front passenger seat was a person in a baseball hat and dark jacket. (ECF No. 93 at 91.) The two then drove a short distance and parked in front of another bank. (ECF No. 93 at 91.) The passenger got out of the vehicle with a suitcase; he was also carrying a second bag. (ECF No. 93 at 91.) The passenger went inside the bank and approached the tellers. (ECF No. 93 at 91.) Clayton drove away. (ECF No. 93 at 91-91.) The passenger remained in the bank for about 45 to 60 minutes. (ECF No. 93 at 92.) After that, he left in an Uber. (ECF No. 93 at 92.)

Cooper identified the passenger as Kevin Mathis[1] and learned that, while in the bank, Mathis made a deposit of $169,650 in currency. (ECF No. 93 at 92.)

Cooper then obtained a warrant to track the location of Mathis's phone. (ECF No. 93 at 93.) From tracking Mathis's phone and reviewing his bank records, Cooper and DEA Special Agent Kellen Williams learned that Mathis had a pattern of traveling to numerous cities in 19 different states, meeting with drug traffickers, picking up bulk currency, depositing that cash into a bank, and then immediately leaving the city. (ECF No. 93 at 97, 196.) Within 24 hours of the deposits, the funds were then withdrawn, often to accounts overseas, but also to cryptocurrency accounts and accounts of other businesses. (ECF No. 93 at 197.)

On January 27, 2021, Mathis's phone returned to Milwaukee. (ECF No. 93 at 97.) On this date Clayton's vehicle and phone left the Tower Avenue address and began to drive on the expressway south toward downtown Milwaukee. (ECF No. 93 at 99.) But he soon turned around and went to Coleman's home. (ECF No. 93 at 99.) Then Clayton was tracked to a property on Granville Circle that he had been known to frequent. (ECF No. 93 at 101.) Clayton then drove toward the airport. (ECF No. 93 at 101.)

Milwaukee County Deputy Sheriff Montrell Hobbs was assigned to the patrol division on January 27, 2021, when he was requested to assist the DEA and the North

---

[1] The passenger was not identified as Mathis at the evidentiary hearing. Rather, the government provides this information in its brief. Mathis is a co-defendant in this action. For the sake of clarity, the court refers to the passenger as Mathis.

Central High Intensity Drug Trafficking Area (HIDTA) in a drug investigation. (ECF No. 93 at 5-6.) Cooper provided Hobbs with a description of Clayton's vehicle and stated that he believed it contained a large amount of money. (ECF No. 93 at 7.) Cooper asked Hobbs to find a reason to pull the car over if he saw it and see if he could find a reason to search the car and find the money. (ECF No. 93 at 7-8, 22-23.)

Later in his shift, at night, Hobbs saw Clayton's vehicle and began to follow it. (ECF No. 93 at 8.) After about a mile he decided to stop the vehicle for speeding. (ECF No. 93 at 9.) Hobbs had paced the vehicle traveling at 65 miles per hour in portions of the expressway where the speed limit was variably 50 or 55 miles per hour. (ECF No. 93 at 9-10.) The vehicle had also drifted into the distress lane. (ECF No. 93 at 10.)

Hobbs identified the driver as Clayton. (ECF No. 93 at 11.) Clayton was friendly, but nervous; his hands were shaking. (ECF No. 93 at 12.) Hobbs noticed the windshield of the car was tinted below the "AVIS line."[2] (ECF No. 93 at 13.) Hobbs regarded this unlawful window tint as a safety issue because it reduced the driver's visibility at night. (ECF No. 93 at 13.) Therefore, he decided to tow the vehicle and impound it. (ECF No. 93 at 13.) The Milwaukee County Sheriff's Office does not have a policy regarding towing vehicles that have illegal tint. (ECF No. 93 at 25.) But Hobbs has towed vehicles at least 25 times for having illegal window tint. (ECF No. 93 at 25.)

---

[2] While the court is unfamiliar with the term "AVIS line," it presumes Hobbs was referring to the line discussed in Wis. Trans. § 305.34(6)(c), which authorizes tinting of a windshield only "outside the critical area and above the horizontal line delineated by the mark '<u>A</u>' or 'A.'"

When Hobbs checked Clayton's criminal history and saw that he had a record of drug offenses, Hobbs requested a dog be brought to the scene. (ECF No 93 at 14.) It took "no longer than 30 minutes" for an officer from a suburban police department to arrive with her dog. (ECF No. 93 at 15, 24.) The dog went around the car but did not detect controlled substances. (ECF No. 93 at 15.)

Hobbs then conducted an inventory search of the car in preparation for towing. (ECF No. 93 at 16.) Behind the driver's seat Hobbs found a black backpack that contained a large amount of cash. (ECF No. 93 at 17.) Hobbs took the backpack and the money and eventually turned them over to the DEA. (ECF No. 93 at 17-18.) Clayton was not arrested, but Hobbs issued him three citations for the violations he observed. (ECF No. 93 at 18.) He did not, however, create a written inventory of anything taken from the car. (ECF No. 93 at 27.) Hobbs dropped Clayton off where he requested. (ECF No. 93 at 18.) Clayton picked his vehicle up from the impound lot a few days later. (ECF No. 93 at 25-26.)

### 2.2. Analysis of the Alleged Inventory Search

While Hobbs testified that he uncovered the money pursuant to an inventory search, in responding to Clayton's motion to suppress the government offers only a cursory argument to support that exception to the warrant requirement. (ECF No. 84 at 23-24.) It argues that, once Hobbs determined that Clayton's vehicle was unsafe to drive, he was permitted to tow it and conduct an inventory search. (ECF No. 84 at 24.)

> "[I]nventory searches are now a well-defined exception to the warrant requirement of the Fourth Amendment." *Colorado v. Bertine*, 479 U.S. 367,

371 (1987). When law enforcement takes possession of a car by towing it, they may look through the vehicle for the purpose of protecting the owner's property, protecting the police against false claims for lost or damaged property, and ensuring their own safety. *Id.* … An inventory search, however, must be conducted pursuant to established standard procedures. *See Florida v. Wells*, 495 U.S. 1, 4 (1990).

*United States v. Travis*, No. 21-CR-91, 2021 U.S. Dist. LEXIS 242579, at *10 (E.D. Wis. Oct. 14, 2021). "An inventory search must follow local police procedures and cannot be used merely as a pretext for an investigation." *See United States v. Velarde*, 903 F.2d 1163, 1166 (7th Cir. 1990) (citing *Bertine*, 479 U.S. at 372).

In arguing that the inventory search was proper, the government skips over important factual and legal questions—whether the vehicle really was unsafe to drive and whether that justified towing it. The decision to impound a vehicle must be assessed separately from the decision to conduct an inventory search. *United States v. Cartwright*, 630 F.3d 610, 614 (7th Cir. 2010); *United States v. Taylor*, 636 F.3d 461, 465 (8th Cir. 2011) ("The validity of an impoundment is not dispositive of the validity of an inventory search."); *United States v. Duguay*, 93 F.3d 346, 351 (7th Cir. 1996). And an inventory search is justified only if police lawfully have custody of the vehicle, *United States v. Cherry*, 436 F.3d 769, 775 (7th Cir. 2006).

While Clayton appears to argue that the illegal tint was too trivial to merit impounding his truck, for present purposes the court will presume that the Fourth Amendment permits towing and impounding vehicles for even the most minor of equipment violations. *Cf. Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) (holding

10

that the Fourth Amendment permits warrantless arrests for even very minor criminal offenses). Nonetheless, the search must be conducted pursuant to standard police procedures. *Cherry*, 436 F.3d at 772. The Milwaukee County Sheriff's Office does not have a policy for towing vehicles for illegal tint. (ECF No. 93 at 25.) Nor is there any evidence of it having a policy regarding towing vehicles for equipment violations generally.

But even if the court could conclude that the impoundment of the vehicle was lawful, the propriety of an inventory search is more narrowly circumscribed. It is permissible only under certain circumstances. Most significantly, inventory searches are one area of Fourth Amendment law where motive matters. *See, e.g.*, *Taylor*, 636 F.3d at 465 (citing *Whren v. United States,* 517 U.S. 806, 812 (1996) and noting that an officer's motive may invalidate objectively justifiable behavior in the context of an inventory search). While the existence of *mixed* motives will not invalidate an inventory search, *United States v. Lomeli*, 76 F.3d 146, 148 (7th Cir. 1996), this is an extraordinary case where the facts establish that the inventory search arose from *wholly* investigatory motives.

"[A]n inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence." *Wells*, 495 U.S. 1, 4 (1990). It is implausible that, but for Hobbs's desire to find a means to search the vehicle, he would have decided to tow the car and thus conduct an inventory search. Hobbs's testimony that the vehicle was unsafe to drive was not credible. As described to the court, the violation that allegedly made the vehicle unsafe to drive was exceedingly minor: some degree of tint somewhat below the

point where tint is permitted on a windshield. It was so minor, in fact, that Clayton was allowed to retrieve his vehicle from the tow lot in short order and drive it away in the same purportedly unsafe condition.

Moreover, the decision to tow the vehicle arose only *after* the canine failed to alert to the vehicle. Hobbs's testimony that he decided to tow the vehicle immediately upon approaching and noticing that the windshield was tinted (ECF No. 93 at 13) is similarly not credible. If Hobbs had immediately concluded that the vehicle was unsafe and that he was going to tow it and conduct an inventory search, it makes little sense to call for a dog to sniff the vehicle. While an inventory search might not uncover all that a canine could detect, conducting an inventory search would seem like the logical and most efficient first step rather than calling for a dog from another police department and waiting half an hour for the dog to arrive (Tr. 93 at 17). The inventory search may either uncover the money that was the whole reason for the traffic stop or otherwise provide probable cause for a further search. Either way, the inventory search could negate the need for the dog.

At a minimum, the court would expect that Hobbs would have conducted his inventory search while he waited for the dog, but he did not. To the extent that Hobbs may have chosen to wait until a second officer was with him before he began any sort of search, it is notable that the dashcam recording shows that he explicitly told his

dispatcher that he did not need another deputy sheriff to meet him; instead, he sought only an officer with a dog.

Based on the video of the traffic stop, Hobbs did not request a tow truck until 8:09 PM, which was about 50 minutes after he allegedly first noticed the tinted windshield and made the decision to tow the truck, about 15 minutes after the dog went around the truck without alerting, and ten minutes after he searched the truck and found the money. Hobbs never mentioned the tinted windows to Clayton until after the search. And when he did say something to Clayton, the discussion that resulted reveals why such a discussion should have preceded any decision to tow the truck or conduct an inventory search. Clayton explained that he obtained the truck from the dealership with the windshield tinted, which means the tint might not have been unlawful, *see* Wis. Admin. § Trans. 305.34(6)(b) (stating that prohibition on anything "placed or suspended in or on the vehicle or windshield so as to obstruct the driver's clear vision through the windshield" does not apply to "[w]indshields tinted by the manufacturer of the glazing and installed as part of the original manufacturing process").[3] Taken together, the timing

---

[3] Hobbs also asked Clayton if he had a "prescription" for the tint. This question appears to come from the fact that Wisconsin law allows for certain otherwise illegally tinted windows if medically recommended. Wis. Admin. § Trans. 305.32(4)(b)3. Insofar as this question reflects Hobbs's understanding that a tinted windshield may be permitted under some circumstance, it undermines his assertion that unlawful tint is inherently unsafe. It is also notable that Hobbs asked this question, which he apparently believed would have made the tint legal, only after he had conducted the inventory search. But the question also reflects a misunderstanding of the law. Although there is a medical exception for tint of side, rear, and vent windows, the regulations do not provide a similar exception for windshields.

of Hobbs's actions tends to support the conclusion that, but for the discovery of the money and the need to rationalize his search, Hobbs had no intention of towing the truck.

The fact that Hobbs may have towed other vehicles for illegal tint (ECF No. 93 at 25) is not enough to justify his actions here. The court has not been presented with any details regarding those other instances. The nature and extent of illegal tint in windows, and the overall circumstances of an encounter, may vary greatly, and the government has not shown that any prior instance was comparable or even lawful.

Also of note is the fact Hobbs did not prepare an inventory of the search. As this court recently noted in another case involving an alleged inventory search by Hobbs, "[t]he policy or practice governing inventory searches should be designed to produce an inventory." *Travis*, 2021 U.S. Dist. LEXIS 242579, at *12 (quoting *Wells*, 495 U.S. at 4). In that case the court recognized that Hobbs may not have prepared an inventory of his search because the only property of value he identified was a firearm, and he recorded the firearm in another report.

But that cannot be said here. Hobbs discovered extremely valuable property—a backpack with about $150,000 in cash—and apparently made no written inventory or other record to document his seizure and safeguarding of the property. Instead, he simply took the backpack containing the cash and turned it over to the DEA (again, without personally documenting the transfer). This failure to follow basic procedures that exist to justify inventory searches—the safeguarding of citizen property and the

protection of police against false claims—supports the conclusion that this was a purely investigatory search at its inception and not an inventory search. *See Taylor*, 636 F.3d at 465. Thus, the government has failed in its burden to prove that the inventory search exception to the Fourth Amendment's warrant requirement applies. Therefore, the court turns to the government's primary argument—that probable cause existed to search the vehicle and that the search was lawful under the automobile exception to the Fourth Amendment's warrant requirement.

### 2.3. Analysis of Probable Cause to Search the Truck

"A vehicle may be stopped and searched without a warrant if there is probable cause to believe the vehicle contains contraband or other evidence of illegal activity." *United States v. Seymour*, 519 F.3d 700, 713 (7th Cir. 2008) (quoting *United States v. Navarro*, 90 F.3d 1245, 1252 (7th Cir. 1996)); *see also United States v. Reaves*, 796 F.3d 738, 742 (7th Cir. 2015). "Probable cause exists where 'under the totality of the circumstances, it is fairly probable that the car contains contraband or evidence.'" *Seymour*, 519 F.3d at 713 (quoting *United States v. Webb*, 83 F.3d 913, 916 (7th Cir. 1996)).

Hobbs did not know the details of the DEA investigation. Thus, there is no argument that he personally had probable cause to search Clayton's vehicle. To bridge this gap the government relies on the collective knowledge doctrine, arguing that Cooper's knowledge can be imputed to Hobbs. "When law enforcement officers are in communication regarding a suspect … the knowledge of one officer can be imputed to

the other officers under the collective knowledge doctrine." *United States v. Lenoir*, 318 F.3d 725, 728 (7th Cir. 2003); *see also United States v. Eymann*, 962 F.3d 273, 284 (7th Cir. 2020) ("[W]here law enforcement authorities are cooperating in an investigation, as here, the knowledge of one is presumed shared by all.") (quoting *Illinois v. Andreas*, 463 U.S. 765, 771 n.5 (1983)).

In *United States v. Ellis*, 499 F.3d 686, 688 (7th Cir. 2007), officers conducting a drug investigation surrounded a home. An occupant speaking with officers at the front door denied living at the home, refused to open the door, and refused to let the officers come in, purportedly to look for a missing child, actions that the officers at the front door found suspicious. *Id.* at 690. An officer at the side door heard a person running up and down the stairs, which he took to be a person trying to destroy evidence. *Id.* at 688. He called this out to officers at the front door, one of whom came to the side door, at which point the two of them broke down the door and entered the home. *Id*. The court of appeals found the entry unlawful because the officer at the side door decided to force entry without knowledge of the events occurring at the front door and before the officer from the front door came to the side door. *Id.* at 690. Thus, the entry was based on only the facts that led the officers to come to the house in the first place and the fact that a person was heard running up and down the stairs, which the court concluded were not enough to justify the warrantless entry. *Id.* at 692.

*Ellis* stands for the principle that the collective knowledge doctrine does not authorize a retrospective cobbling together of details known separately by various officers. While an officer need not know all the details of an investigation before he can act, *Ellis* makes clear that an officer must either receive from a colleague information that, when combined with his personal knowledge, provides a lawful basis for the action, or receive from a colleague an instruction that suggests the colleague concluded that a lawful basis for an action exists.

There is no evidence that Cooper said anything to Hobbs that Hobbs could have reasonably understood as reflecting Cooper's conclusion that probable cause existed to search Clayton's vehicle. Nor did Cooper simply instruct Hobbs to stop and search Clayton's vehicle. To the contrary, Hobbs testified that Cooper communicated to him that this was a "make-your-own case," which Hobbs described as a situation where he has "to find probable cause in order to get to a certain point. So you have to find probable cause to pull the vehicle over, you have to find probable cause to search the vehicle, do whatever." (ECF No. 93 at 22; *see also* 93 at 7 ("[Cooper] informed me that there would be a vehicle that would be traveling with a large amount of money. He told me that obviously I had to find probable cause to pull the vehicle over. Once I pulled the vehicle over, it was basically a make-your-own case.").

The government tries to characterize the "make your own case" instruction as simply a request that Hobbs find a cover story for his actions so as to not alert Clayton to

the fact that he was under investigation. (ECF No. 84 at 17; *see also* ECF No. 84 at 22 (characterizing Cooper as having "told Deputy Hobbs to try and develop his own probable cause to stop and search Clayton's vehicle to protect the investigation").) While such a request would not be unusual, *see United States v. Chavez*, 534 F.3d 1338, 1342 (10th Cir. 2008), there is no evidence that this was the nature of Cooper's request or that Hobbs characterized his actions as an inventory search simply so as to not to alert Clayton to the DEA's investigation.

To the contrary, even at the evidentiary hearing, when faced with the implausibility that a minor equipment violation led him to immediately decide to tow the truck, Hobbs steadfastly maintained that he acted solely on his own observations and conducted an inventory search. If it had really all been a ruse, there would have been no need to maintain the pretense at the hearing. And there is no evidence that there was a miscommunication, *e.g.*, that Cooper instructed Hobbs to merely find a cover story, but Hobbs misunderstood that he had to actually find a lawful basis for all his actions. Consistent with Hobbs's testimony, Cooper testified that he "asked [Hobbs] to try to find probable cause to stop Mr. Clayton's vehicle; that we believed that he was transporting bulk currency towards the airport in Milwaukee." (ECF No. 93 at 163.)

*United States v. Rodriguez*, 831 F.2d 162, 165 (7th Cir. 1987), upon which the government relies (ECF No. 84 at 21), is distinguishable. There, DEA investigators asked state police to conduct a "routine traffic stop" of a vehicle and to identify the driver. The

DEA investigators had reasonable suspicion to stop the car, and this was imputed to the state police by virtue of the request for a "routine traffic stop."

Distinguishable, too, is *United States v. Celio*, 945 F.2d 180 (7th Cir. 1991), another case relied on by the government (ECF No. 84 at 21). In *Celio*, DEA investigators had probable cause to stop and search a vehicle but asked state law enforcement to do so. Although the DEA request was simply that "the Illinois State Police stop and search the truck in connection with suspected drug smuggling," *Celio*, 945 F.2d at 182, the state officers were entitled to rely on it without needing to know the details of the investigation that led to the DEA's request. *Id*.

In both *Rodriguez* and *Celio* the DEA investigators told state police to stop a car, which is the sort of instruction officers are permitted to act upon under the collective knowledge doctrine. But Cooper did not instruct Hobbs to stop a car. Rather, he requested that he see if he could find a basis to stop and search the car. By making it clear that it was up to Hobbs to find a lawful basis for his action, Cooper was effectively telling Hobbs that the DEA had not developed probable cause to stop and search the vehicle.

Closer to the present facts is *United States v. Chavez*, 534 F.3d 1338 (10th Cir. 2008), where the DEA asked a state police officer to stop a truck but stated he would need to develop his own probable cause for the stop. *Id.* at 1341. The DEA also told the state police officer that the truck would be carrying cocaine. *Id*.

19

But as in *Rodriguez* and *Celio*, the Court of Appeals for the Tenth Circuit characterized the DEA as having instructed the state officer to stop the truck. *Id.* at 1345. It regarded the request that the state officer find his own probable cause to stop the vehicle as simply a means for ensuring the secrecy of the investigation. Although the government makes the same argument here, unlike the present case, in *Chavez* there was evidence that the DEA's instruction really was made simply to make the traffic stop seem routine and random. *Id.* at 1342. Thus, the court concluded that the search was authorized under the collective knowledge doctrine.

Ultimately, the requirement of communication elucidated in *Ellis* controls the outcome of this case. Putting the present facts into the context of those in *Ellis*, Hobbs was in the position of the officer at the side door and Cooper was at the front door. While Cooper may well have had probable cause to search the car and could have relayed that information to Hobbs, the government has failed in its burden to show that this information was actually conveyed to Hobbs. Although Hobbs testified that Copper told him that "there would be a vehicle that would be traveling with a large amount of money" (ECF No. 93 at 7), without Cooper characterizing his knowledge in some manner that would convey the existence of probable cause (as opposed to reasonable suspicion or a mere hunch), this information is insufficient to support a search of the vehicle. Moreover, the court cannot overlook the fact that Cooper communicated to Hobbs that it was a "make-your-own case," thus conveying to Hobbs he was to rely only on the

information he observed and implying that the DEA did not have probable cause for a search.

Consequently, the government has failed to demonstrate that Cooper relayed to Hobbs information sufficient to impute to Hobbs what Cooper knew. Because the government has failed in its burden to show that an exception to the warrant requirement justified the search of the truck and the seizure of the money in the backpack, the court must recommend that the money be suppressed and excluded from any trial in this matter.

### 3. Arrest of Clayton on March 16, 2021 (ECF No. 41)

#### 3.1. Additional Facts

Following the seizure of nearly $150,000 by Hobbs on January 27, 2021, the investigation into Clayton continued. Just 11 days later, on February 9, 2021, Cooper saw that Mathis's phone was back in Milwaukee and again by the airport. (ECF No. 93 at 102.) Consistent with Mathis's past practice in other cities, Cooper believed that Mathis was in the city to pick up cash to launder. (ECF No. 93 at 97-98.)

Investigators established surveillance and observed Clayton meet with Mathis by a hotel, at which point Mathis left in an Uber and went to the same bank he had visited in the past. (ECF No. 93 at 103.) Mathis deposited $200,000 in cash at the bank. (ECF No. 93 at 103.)

Eleven days later the pattern repeated. On February 20, 2021, Mathis's phone was identified as being in Milwaukee and by the airport. (ECF No. 93 at 104.) Clayton's phone was likewise near the airport and in close proximity to Mathis's. (ECF No. 93 at 104.) Mathis again went the same bank and deposited about $106,000 in cash. (ECF No. 93 at 104.)

On March 11, 2021, the same thing happened. Mathis's and Clayton's phones were in close proximity near the Milwaukee airport before Mathis took an Uber to the same bank and deposited about $200,000 in cash. (ECF No. 93 at 104-05.)

On March 16, 2021, Cooper was monitoring the pole camera at 5270 W. Clinton Avenue because he saw that Clayton's phone and the Kia were in the area. (ECF No. 93 at 106-07.) Cooper observed that Clayton was in the parking lot along with Coleman and Coleman's black Dodge Ram pickup truck.[4] (ECF No. 93 at 108.) Soon a white van with Iowa license plates came into the parking lot and backed up to the bed of Coleman's pickup. (ECF No. 93 at 109.) The driver of the van and Coleman lifted a half pallet out of the van and put it into the bed of Coleman's truck. (ECF No. 93 at 109.) The pallet was similar to those Cooper had observed as having been shipped from Texas except for the fact that this pallet was about half the size and wrapped in green as opposed to clear

---

[4] Both Coleman and Clayton had separate black Dodge Ram pickup trucks. (ECF No. 93 at 126.) Clayton's had license plate RE4384. (ECF No. 43-1, ¶ 16.) Coleman's had license plate 72299X. (ECF No. 43-1, ¶ 25.)

plastic. (ECF No. 93 at 110, 135.) After some brief conversations, all three vehicles left the parking lot. (ECF No. 93 at 109-10.)

Believing that Coleman's truck was going to the residence on Tower Avenue, DEA Special Agent Williams drove to the area to take up surveillance. When he arrived, he drove past the house and saw the pickup backed into the driveway with the tailgate open and a rollup cover completely covering the bed of the pickup. (ECF No. 93 at 199.) Despite having conducted surveillance of this residence many times in the prior months, never before had investigators seen anyone other than Clayton at the residence or a vehicle in the driveway. (ECF No. 93 at 200.)

Williams turned around and drove past the home a second time, at which point he saw the Kia parked on the side of the residence. (ECF No. 93 at 199.) Based on remote tracking of the Kia, Clayton had driven directly from the Clinton Avenue address to the residence on Tower Avenue. (ECF No. 93 at 112.) Williams then parked in a nearby parking lot, where he had a limited view of the front door and part of the garage door. (ECF No. 93 at 199.)

Williams maintained surveillance of the residence and alerted other agents when he saw the pickup truck begin to move. (ECF No. 93 at 202.) Williams later saw Clayton leave the residence, at which time Williams decided to stop and arrest him. (ECF No. 93 at 203.) When Williams asked Clayton if anyone else was inside the home, Clayton did not respond. (ECF No. 93 at 203.) Williams searched Clayton and recovered keys and a

cell phone from his person. (ECF No. 93 at 204.) Williams gave the keys to other investigators and directed them to conduct a protective sweep of the Tower Avenue residence. (ECF No. 93 at 204.)

### 3.2. Analysis Regarding the Arrest of Clayton

A warrantless arrest must be supported by probable cause. *Beck v. Ohio*, 379 U.S. 89, 91 (1964); *Navarro*, 90 F.3d at 1254. Probable cause is not a term capable of precise definition because it is a fluid concept that depends on context. *Navarro*, 90 F.3d at 1251 (citing *Ornelas v. United States,* 517 U.S. 690, 698 (1996)). "[I]t is a practical, nontechnical conception" regarding probabilities and "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Illinois v. Gates*, 462 U.S. 213, 231 (1983) (citations omitted).

"The principal components of a determination of … probable cause will be the events which occurred leading up to the [arrest], and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to … to probable cause." *Ornelas*, 517 U.S. at 696. This means that, under the totality of the circumstances, officers must "reasonably believe that a particular individual has committed a crime." *Navarro*, 90 F.3d at 1254 (quoting *United States v. Gilbert,* 45 F.3d 1163, 1166 (7th Cir. 1995)). Although more than mere suspicion is required, probable cause does not require virtual certainty. *Gilbert*, 45 F.3d at 1166 (citing *Gates*, 462 U.S. at 295 (1983) ("probable cause requires only a probability or substantial

chance of criminal activity, not an actual showing of such activity")). To sustain a warrantless arrest, the government need only establish probable cause that the defendant committed a crime; it need not have probable cause for every crime suspected or probable cause for any specific crime.

In this regard it would seem simple for the government to establish probable cause to arrest Clayton. After all, he delivered nearly $150,000 in cash to an undercover officer. A fair presumption is that this was for the purpose of laundering the money, and the government argues as much. It states, "During Dwight Clayton's meeting with the undercover officer Clayton turned over to the officer $149,000 in United States currency to be laundered by the undercover agent." (ECF No. 84 at 7.) But its citation to page 87 of the evidentiary hearing transcript does not support this assertion. The relevant testimony on that page was only that "[o]n that day [November 3, 2020] an undercover officer met with Mr. Clayton in Milwaukee and Mr. Clayton turned over approximately $150,000 in bulk U.S. currency to the undercover officer." (ECF No. 93 at 87.) There is no suggestion that the purpose of the exchange was to launder money.

When the presumption of some manner of criminality seems obvious, as here, it might seem tempting to ignore this gap in the evidence. But the court finds it inappropriate to do so. Although it is undoubtedly highly unusual for someone to deliver a large amount of cash in this manner, the record lacks any additional detail that can give rise to probable cause that this single incident, standing alone, constituted a crime.

Having said that, Clayton's delivery of money to the undercover officer fits into a pattern of incidents that, taken together, strongly supports an inference that Clayton was involved in money laundering. Investigation into Mathis identified a pattern in which he would fly into cities, make large cash deposits, and quickly leave the city, which conduct investigators identified as consistent with money laundering. Clayton's interactions with Mathis fit this pattern. In just over a month in early 2021 Mathis made three trips to Milwaukee, and each time he first met with Clayton and then made a large cash deposit at a local bank. In total, Mathis deposited over half a million dollars from just these three visits. Moreover, investigators knew that Clayton was previously convicted in federal court of money laundering. (Case No. 04-CR-66 (E.D. Wis.) ECF No. 162.)

These facts might not support proof beyond a reasonable doubt, but probable cause need not. *United States v. Funches*, 327 F.3d 582, 586 (7th Cir. 2003) ("Determinations of probable cause are naturally based on probabilities, and a finding of probable cause 'does not require evidence sufficient to support a conviction, nor even evidence demonstrating that it is more likely than not that the suspect committed a crime.'") (quoting *United States v. Carrillo*, 269 F.3d 761, 766 (7th Cir. 2001)). The inconsistency of these facts with lawful business practices, and their consistency with money laundering, readily establishes probable cause to believe that Clayton was involved in money laundering. Clayton was identified as being associated with as many as four separate persons believed to be involved in money laundering—the person from Illinois, the

investigation of whom first led to the identification of Clayton; the undercover officer; an undescribed person associated with an investigation from another DEA office that led to them receiving bulk currency from Clayton (ECF No. 93 at 83); and Mathis—and perhaps more (ECF No. 93 at 89 (Cooper testifying "We had received information that other DEA offices were attempting to pick up money from Mr. Clayton …."))). And that is all without consideration of the nearly $150,000 seized by Hobbs. Perhaps it may be possible to conceive of some innocent explanation for this conduct, but probable cause does not require the negation of all innocent explanations.

Because the laundering of cash suggests that the source of that cash is illicit, the fact that a person is engaged in the laundering of cash tends to suggest that the person is acquiring income through some unlawful means. Clayton's money laundering activity, his connection to the owner of a business that was to receive a pallet that was found to contain 61 kilograms of cocaine, the fact that Clayton was observed picking up a very similar pallet, the informant's tip, Clayton's prior federal drug conviction, and other facts, all add up to probable cause to believe that Clayton had violated federal controlled substances laws. While Clayton argues that this information was "stale" (ECF No. 82 at 8), staleness is a term generally reserved to probable cause to search, *see United States v. Pappas*, 592 F.3d 799, 803 (7th Cir. 2010). Aside from the statute of limitations for the underlying crime, probable cause to arrest does not have an expiration date. Thus, the

court easily finds that probable cause existed to arrest Clayton when he was stopped and arrested on March 16, 2021.

Having lawfully arrested Clayton, investigators were permitted to search him incident to arrest, and therefore lawfully recovered his house key. *Chimel v. California*, 395 U.S. 752, 762–63 (1969). Clayton argues that the investigators' initial warrantless entry to his home was unlawful. Although agents subsequently obtained a warrant to search the home, Clayton argues that the warrant was tainted by the allegedly illegal entry. He notes that the affidavit submitted in support of the search warrant included the following observation from the initial warrantless entry: "While clearing the garage, case agents observed the pallet that was seen being loaded into COLEMAN's truck in the garage of the residence." (ECF No. 43-1, ¶ 27.) For reasons explained below in Section 5, the court finds this statement immaterial to whether probable cause existed to search the residence. Therefore, it is unnecessary to further consider whether the agents' warrantless entry to the home was unlawful. *Cf. United States v. Ross*, 741 F.3d 743, 748 (7th Cir. 2013) (noting that exigent circumstances may exist if there is "a need to prevent the imminent destruction of evidence"); *United States v. Henderson*, 748 F.3d 788, 791 (7th Cir. 2014) (discussing a protective sweep).

### 4. Coleman's Motions Regarding Stop (ECF No. 29), Arrest (ECF No. 30), and Search (ECF No. 31)

#### 4.1. Additional Facts

On March 16, 2021, a lieutenant assigned to HIDTA requested that Milwaukee Police Officers Jose Viera and Jeff Cline assist DEA personnel in stopping a vehicle and arresting a person. (ECF No. 93 at 36.) They were provided Coleman's name and a description of his Dodge Ram truck. (ECF No. 93 at 44.) Prior to encountering Coleman, Viera used his squad car computer to find a picture of Coleman. (ECF No. 93 at 48.)

Viera and Cline initiated a traffic stop of Coleman's truck, with Coleman stopping on Carmen Avenue, just east of 76th Street. (ECF No. 93 at 38.) Viera and Cline approached the driver's side of the truck, Cline identified Coleman as the person they were looking for, and Viera instructed him to get out of the truck. (ECF No. 93 at 39.) Viera then handcuffed Coleman. (ECF No. 93 at 39.)

Coleman's truck did not display a rear license plate, which ordinarily would be a violation of Wisconsin law. (ECF No. 93 at 46.) But because the truck displayed an apportioned plate in the front, it was not required to display a rear plate. (ECF No. 93 at 46.) While radio traffic preceding the stop reflects that investigators discussed identifying a reason for the stop and mentioned the absence of a rear plate, neither the absence of a rear plate nor any other traffic violation was the reason for the stop. Viera and Cline stopped the truck because Cooper told them to. (ECF No. 93 at 46-47.) And Viera and Cline were told that Coleman was to be immediately arrested.

Within perhaps three minutes Cooper arrived at the traffic stop and spoke briefly with Coleman. (ECF No. 93 at 40-42.) Cooper then asked Viera and Cline to transport Coleman to the District Four police station and wait for further instructions. (ECF No. 93 at 42.) Less than ten minutes passed from the time they stopped the truck to when they departed with Coleman. (ECF No. 93 at 57.) No search of the truck had been conducted by the time they left. (ECF No. 93 at 57-58.)

DEA Special Agent Scott Marlow arrived shortly after Coleman left. Marlow conducted an inventory search of the pickup because it was going to be towed to DEA headquarters. (ECF No. 93 at 209-11.) Multiple cell phones, documents, and a toolbox containing ten kilograms of cocaine were seized from the pickup. (ECF No. 93 at 211-12.)

### 4.2. Analysis of Coleman's Stop and Arrest

Although the Milwaukee Police Department was conducting a separate investigation into Coleman, the government does not provide any details regarding it. (*See, e.g.*, ECF No. 93 at 94-95.) Thus, it does not argue that any details from that investigation added up to probable cause to arrest Coleman.

Viera and Cline had no knowledge of the facts underlying the DEA investigation. Nonetheless, to stop Coleman's truck they were entitled to rely on instructions from those who knew the details that added up to probable cause. This scenario, unlike Hobbs's stop of Clayton, represents an appropriate application of the collective knowledge doctrine,

*see United States v. Gary*, 790 F.3d 704, 706 (7th Cir. 2015), provided the DEA investigators had probable cause for the stop and arrest of Coleman.

Prior to Coleman's stop and arrest, DEA investigators had developed probable cause to believe that Clayton was involved in distributing controlled substances and laundering large amounts of money. Coleman was known to be an associate of Clayton's and to be in frequent contact with him. (ECF No. 93 at 94, 95-96.) They had been co-defendants in a 2004 federal drug case that involved the distribution of more than five kilograms of cocaine. *See United States v. Coleman*, 231 F. App'x 512, 513 (7th Cir. 2007), *sentence vacated and remanded*, 290 F. App'x 938 (2008), *appeal dismissed*, 409 F. App'x 956 (2011); *see also* 04-CR-66 (E.D. Wis.). Coleman was still on supervised release for that conviction. (ECF No. 93 at 170.)

In one instance when investigators believed that Clayton was preparing to meet with his money launderer, Clayton stopped at Coleman's home. (ECF No. 93 at 99.) Clayton's conduct in this time period was, based on Cooper's training and experience, consistent with a drug dealer collecting money owed to him, suggesting that Coleman was one of Clayton's distributors. (ECF No. 93 at 182.)

Coleman was then involved in the events of March 16, 2021, where he was seen helping load the half-pallet from the transit van into his Dodge Ram pickup. He then drove to Clayton's home on Tower Avenue.

Clayton owned a trucking company, and by virtue of its apportioned license plate, there was reason to believe that Coleman's truck was used commercially. In this regard, perhaps the transportation of a plastic-wrapped pallet might not have been unusual for Clayton and Coleman. But investigators had multiple reasons to doubt the legitimacy of Clayton's trucking business. Aside from the informant's tip that the business was a front for money laundering, three of Clayton's trucks "basically never moved and one or two would sporadically move." (ECF No. 93 at 180.) And, despite frequent surveillance, there was no evidence that either Clayton or Coleman was engaged in a legitimate business of transporting pallets of products. To the contrary, there was only a single instance of either having been observed transporting such a pallet, and that was when Clayton was recorded picking up a pallet that was shipped from Texas that was essentially the same as the one that had been found to contain 61 kilograms of cocaine. From these facts and the strong evidence that Clayton was involved in laundering very large sums of money, it was reasonable for investigators to infer that Clayton was receiving large quantities of controlled substances that were shipped to him in pallet form.

Supporting the suspicion that the green-wrapped half pallet was one such pallet is the fact that Coleman immediately transported the pallet from Clayton's business to Clayton's home. There were two relevant inferences from this conduct. First, because Clayton was known to have a similar pickup truck, the fact that he called upon Coleman

to transport the pallet suggests that Coleman was closely involved in Clayton's business and not simply a friend who happened to have a truck.

Second, the delivery to Clayton's business parking lot and then immediately to his home reflects an effort to conceal the ultimate destination of the delivery. Had this been an innocent delivery, the commercially reasonable approach would have been to have the delivery made directly to Clayton's home.

Taken together, all of these details add up to probable cause to believe that the half-pallet contained controlled substances. The fact that it was only a half-pallet and wrapped in green plastic, whereas the prior pallets were full pallets and wrapped in clear plastic, is insufficient to undermine the existence of probable cause. In some respects, it should hardly be surprising that the organization made some changes after law enforcement intercepted 61 kilograms of cocaine. Ultimately, it is the similarity in the methods that tends to support probable cause.

This does not end the analysis, however. There must also be probable cause that Coleman knew that the pallet contained controlled substances. After all, he could have been innocently helping out a friend without knowing what was in the pallet. But again, probable cause does not require the negation of innocent explanations. And there are sufficient facts to support an inference that Coleman was complicit. As noted, the manner of the delivery—first to Clayton's commercial parking lot and then to Clayton's home— was not consistent with a commercially reasonable practice. And given that Clayton had

a similar truck, if Coleman was not complicit, the fact that Clayton did not simply transport the pallet himself (as he had done with a prior pallet) is suspicious.

There is then the fact that Clayton stopped by Coleman's home on his way to meet with a money launderer, which Cooper described as consistent with picking up cash from customers, supporting the inference that Coleman was involved in the activity that generated funds that Clayton needed to launder. And the fact that they had been previously convicted together for conspiring to distribute more than five kilograms of cocaine also supports a finding of probable cause. (*See* 04-CR-66 (E.D. Wis.), ECF Nos. 162 (judgment as to Clayton;) 275 (judgment as to Coleman).) Based on this conviction, they were almost certainly prohibited from being in contact with each other, and the fact that they were communicating at all bolstered the existence of probable cause. (*See* 04-CR-66 (E.D. Wis.) ECF No. 275 at 3, ¶ 9 (Coleman's amended judgment of conviction noting that he is prohibited from associating with any person convicted of a felony unless granted permission to do so by the probation office).)

All of these facts taken together add up to probable cause to believe that Coleman had conspired to possess controlled substances. Consequently, there was probable cause to stop his truck on March 16, 2021 and arrest him. The court will recommend that his motions challenging these actions (ECF Nos. 29, 30) be denied.

### 4.3. Analysis of the Search of Coleman's Truck

Coleman was transported away from his truck by the time Marlow began to search it. Therefore, the search cannot be sustained as a search incident to arrest. *See Arizona v. Gant*, 556 U.S. 332, 346 (2009). And the government does not argue that the investigators had probable cause to search the truck under the automobile exception. The only justification that the government gives for the search is that it was an inventory search.

The government's argument in support of the inventory search is brief. Aside from recounting the law regarding inventory searches it argues:

> DEA Special Agent Scott Marlowe [sic] conducted the inventory search per DEA policy of Coleman's vehicle at the scene of the original traffic stop. Once the contents of Coleman's vehicle were inventoried DEA agents arranged for the vehicle to be towed from the scene to the Milwaukee DEA Field Office. Coleman's vehicle was lawfully impounded and transferred to DEA custody and lawfully searched.

(ECF No. 85 at 26.) The government's reply brief has no further argument in support of the search of Coleman's truck. (ECF No. 91.)

The government appears to argue that Coleman's arrest, standing alone, justified the inventory search. (ECF No. 53 at 21-22; *see also* ECF No. 85 at 25 ("Once arrested Jeffrey Coleman's vehicle was subject to an inventory search.").) It quotes (ECF No. 53 at 22) *Cartwright*, 630 F.3d at 614, where the court of appeals said (as it has said in many other cases): "An inventory search is lawful if (1) the individual whose possession is to be searched has been lawfully arrested, and (2) the search is conducted as part of the routine procedure incident to incarcerating an arrested person and in accordance with

35

established inventory procedures." However, the quotation is an oversimplification insofar as it suggests either that an arrest is necessary for an inventory search or that an arrest of a driver, standing alone, is sufficient justification to conduct an inventory search of a vehicle. For example, an equipment violation may result in the lawful impoundment of a vehicle without the arrest of the driver. And not every arrest of a driver leads to police taking custody of the vehicle—for example, when someone else is present to drive the vehicle away.

Although the Court of Appeals for the Seventh Circuit has repeatedly said that "[a]n inventory search is lawful if … the individual whose possession is to be searched has been lawfully arrested," this statement emerged from *Illinois v. Lafayette*, 462 U.S. 640, 643 (1983), where the issue was not the search of a vehicle but an inventory search of a prisoner's personal effects. *See Velarde*, 903 F.2d at 1165 (citing *Lafayette*, 462 U.S. at 643). An inventory search of a vehicle requires a lawful seizure of that vehicle. *See Cartwright*, 630 F.3d at 614. Thus, the court must assess the lawfulness of the seizure of Coleman's truck independent of the lawfulness of the inventory search. *Id.* Although there is evidence that Coleman's truck was used in the transportation of controlled substances, and may have been subject to seizure on that basis, *see, e.g., United States v. Pace*, 898 F.2d 1218, 1244 (7th Cir. 1990), the government does not make that argument.

In fact, the government does not articulate a basis for seizing Coleman's truck. It appears to have been legally parked on a residential street, and notwithstanding his arrest

Coleman presumably could have made arrangements for its timely removal. *Cf. Duguay*, 93 F.3d at 353 ("The decision to impound an automobile, unless it is supported by probable cause of criminal activity, is only valid if the arrestee is otherwise unable to provide for the speedy and efficient removal of the car from public thoroughfares or parking lots."). *But see United States v. Clinton*, 591 F.3d 968, 972 (7th Cir. 2010) ("[T]he Fourth Amendment does not 'demand that police offer a motorist an alternative means of removing his vehicle that will avoid the need to tow it and conduct an inventory search.'" (quoting *Cherry*, 436 F.3d at 775). The government presented no evidence that DEA policy required agents to seize the vehicle in the interest of safeguarding it. *Cf. Travis*, 2021 U.S. Dist. LEXIS 242579, at *11 (noting that Milwaukee County Sheriff's Office policy allows alternatives to towing). And taking possession of a vehicle subjects an agency to potential liability it would not otherwise have been subject to. *See Duguay*, 93 F.3d at 353 (noting that, while an inventory search is meant to mitigate government liability regarding seized vehicles, liability may be avoided by not seizing a vehicle in the first place).

Nor has the government established that the search was conducted in accordance with any established policy. In fact, it has not established that the DEA even has a policy on inventory searches. Marlow testified:

> Q. … To your knowledge, does the DEA have a written policy on inventory searches?
>
> A. I assume it does. It has a policy for everything. But, I believe so.

Q. Have you ever seen it?

A. I'm sure I have.

Q. You weren't using it and didn't have it with you on March 16.

A. No.

Q. You don't have any specific recollection of the policy, if there is one?

A. No.

Q. You hadn't reviewed it prior to this inventory search?

A. I have not, no.

Q. Have you reviewed it since?

A. No.

(ECF No. 93 at 221.)

The court shares Marlow's presumption that the DEA almost certainly has a policy on inventory searches, *see, e.g.*, *United States v. Lomeli*, Case No. 94 CR 173-1, 1995 U.S. Dist. LEXIS 5516, at *6 (N.D. Ill. Apr. 21, 1995) (noting testimony regarding "DEA regulations governing inventory searches"), but without proof of it the court cannot say that the search was conducted in accordance with any established policy or practice, *see Duguay*, 93 F.3d at 351 ("'Standardized criteria or established routine must regulate' inventory searches." (quoting *Wells*, 495 U.S. at 4 (suppressing evidence because the Florida Highway Patrol did not have a policy with respect to opening containers within

a seized car)). Although the policy need not be written, *Duguay*, 93 F.3d at 351, the government has failed to elicit evidence of an unwritten policy or standard practices in the DEA regarding inventory searches.

Because there is no evidence that the search of the vehicle was conducted in accordance with any established policy or procedure, the court cannot conclude that the government has sustained its burden to prove that the inventory search exception to the warrant requirement applies. Consequently, the court must recommend that Coleman's motion to suppress (ECF No. 31) be granted.

### 5. Search Warrant for Clayton's Property (ECF No. 43)

#### 5.1. Relevant Facts

On March 16, 2021, Cooper applied for and received search warrants for the residence at 9736 W. Tower Avenue in Milwaukee, Apartment 301 at 6840 West Granville Circle in Milwaukee, and the silver 2015 Kia Optima. (ECF No. 43-1.) Clayton argues that these warrants were unsupported by probable cause and relied on unlawfully acquired evidence. (ECF No. 43 at 1.)

Because probable cause to support a search warrant is assessed by the four corners of the affidavit submitted in support of the search warrant, *United States v. McMillian*, 786 F.3d 630, 639 (7th Cir. 2015), the facts adduced at the evidentiary hearing are not relevant to this analysis. The court also disregards those facts in Cooper's affidavit that the court in the discussion above has determined were illegally obtained. *See United States v.*

*McMillian*, 786 F.3d 630, 639 (7th Cir. 2015). Thus, with the exception of noting that Coleman drove away from the residence and was stopped by police, the court does not consider the facts contained in paragraphs 23 and 27 of the affidavit. (ECF No. 43-1.) Recited here are only the facts contained in the affidavit that the court considers relevant in assessing whether the warrants were supported by probable cause.

After reciting his experience, Cooper states in his affidavit that Clayton was convicted in federal court in case number 04-CR-66 of conspiracy to possess with intent to distribute five kilograms of cocaine and money laundering. (ECF No. 43-1, ¶ 11.) He was sentenced to 108 months in prison. (ECF No. 43-1, ¶ 11.) The affidavit states that the FBI received an online tip on August 20, 2020, "regarding potential international drug trafficking and tax evasion." (ECF No. 43-1, ¶ 11.) The tip identified Clayton as being involved and stated that he and others were using his business, S&C Trucking LLC, to "hide proceeds." (ECF No. 43-1, ¶ 11.) The tipster knew that Clayton had previously been sent to federal prison on drug charges. (ECF No. 43-1, ¶ 11.)

Cooper confirmed that Clayton was the registered agent of S&C Trucking and that the listed address for S&C was 9736 West Tower Avenue. (ECF No. 43-1, ¶ 13.) Investigators conducted surveillance of this home and had never seen any person or vehicle other than Clayton at the residence. (ECF No. 43-1, ¶ 13.) Cameras mounted around the residence and the closed blinds led Cooper to believe, based on his training and experience, that the home may be a stash house for drugs. (ECF No. 43-1, ¶ 13.)

During the execution of a search warrant at a property that Clayton owned police officers recovered modest amounts of cocaine and marijuana as well as over $12,000 of cash and about $40,000 worth of jewelry. (ECF No. 43-1, ¶ 14.) It also appeared that an additional unknown quantity of cocaine had been flushed. (ECF No. 43-1, ¶ 14.) Clayton told the police that he rented the home to a person whose identification he had never seen nor whom he had ever spoken to on the phone. (ECF No. 43-1, ¶ 15.) He did not have a phone number for his tenant. (ECF No. 43-1, ¶ 15.) He identified his home as the residence on Tower Avenue. (ECF No. 43-1, ¶ 15.)

On September 23, 2020, Clayton was seen accessing a Dodge Ram pickup and driving a Kia Optima. (ECF No. 43-1, ¶¶ 16-18.) The Kia was registered to a woman who "has been identified as a drug trafficker in Milwaukee-area drug investigations dating back to at least 2010." (ECF No. 43-1, ¶ 17.)

On October 20, 2020, investigators in Texas investigated the shipment of a pallet that purported to contain 492 pounds of optical cable and was being shipped from Dixie Cable in Pharr, Texas to Raul Gallegos at a business in Milwaukee. (ECF No. 43-1, ¶ 19.) The shipping records included a phone number for Gallegos. (ECF No. 43-1, ¶ 19.) After a dog alerted to the presence of controlled substances in the pallet, the Texas investigators found 61 kilograms of cocaine concealed in the pallet. (ECF No. 43-1, ¶ 19.)

Investigators identified three prior shipments from Pharr, Texas to the Milwaukee business. Two of those had been picked up at the shipping company on August 28 and

September 25, 2020. (ECF No. 43-1, ¶ 20.) Gallegos's phone records revealed that he had been in contact with Clayton on August 27, 2020, the day before one of the pallets was picked up from the shipping company. (ECF No. 43-1, ¶ 20.)

The first of the three earlier shipments from Pharr, Texas was delivered to the Milwaukee business address on August 14, 2020.[5] (ECF No. 43-1, ¶ 20.) Agents obtained surveillance video that showed Clayton arriving at the business in a Dodge Ram pickup, the bed of which was empty. (ECF No. 43-1, ¶ 20.) A short time later a box truck arrived, and Clayton drove his truck to be near the box truck. (ECF No. 43-1, ¶ 21.) A short time later, Clayton drove away in the pickup, and now a pallet of similar appearance to the one seized in Texas was in the bed of his truck. (ECF No. 43-1, ¶ 20.)

Investigators obtained a warrant to track Clayton's phone (ECF No. 43-1, ¶ 21) and learned that Clayton "spends overnight hours" at the home of the woman to whom the Kia is registered (ECF No. 43-1, ¶ 22). Her address was also used as the location of S&C Trucking. (ECF No. 43-1, ¶ 22.) A tracking warrant for the Kia also showed that Clayton "spent the overnight and early morning hours March 16, 2021 at 6840 West Granville Circle Apartment 301 Milwaukee Wisconsin." (ECF No. 43-1, ¶ 24.) He left that residence at 6:51 AM. (ECF No. 43-1, ¶ 24.) Later that day investigators spoke to Clayton's mother, who resided at this apartment. (ECF No. 43-1, ¶ 28.) She stated that Clayton sometimes

---

[5] While the affidavit stated that the delivery occurred on August 14, 2020, Copper testified at the hearing that delivery occurred on August 21, 2020. (*See, e,g.,* ECF No. 93 at 78, 80, 119, 161.)

sleeps at the residence and stores property there. (ECF No. 43-1, ¶ 28.) However, he did not appear to have a bedroom there. (ECF No. 43-1, ¶ 28.) Cooper stated, "Based on the investigation to date case agents believe Dwight CLAYTON stores drugs, proceeds of drug trafficking, and/or documents related to his drug trafficking and money laundering activities at 6840 West Granville Circle Apartment 301 Milwaukee Wisconsin." (ECF No. 43-1, ¶ 28.)

Just before 8:00 AM on March 16, 2021, agents monitoring a camera at the parking lot at 5270 West Clinton Avenue, where Clayton stores several dump trucks belonging to S&C Trucking, noticed that Clayton was at the lot in the Kia. (ECF No. 43-1, ¶ 25.) Present, too, was Coleman, who was in a Dodge Ram pickup with a license plate different from the truck Clayton was previously seen driving. (ECF No. 43-1, ¶ 25.)

Soon a white Ford van with Iowa license plates arrived at the lot and backed up to the bed of Coleman's pickup. (ECF No. 43-1, ¶ 25.) Coleman and another male loaded a shrink-wrapped pallet from the van into Coleman's truck. (ECF No. 43-1, ¶ 25.) All three vehicles then left the parking lot. (ECF No. 43-1, ¶ 25.) Cooper states, "Based on the observations made on camera and the investigation to date case agents believe the pallet contained a quantity of narcotics." (ECF No. 43-1, ¶ 25.)

Based on tracking of the Kia, Clayton went directly from the Clinton Avenue parking lot to his home on Tower Avenue. (ECF No. 43-1, ¶ 25.) When case agents arrived at the Tower Avenue residence they saw that the Dodge Ram Coleman had been driving

was backed into the driveway. (ECF No. 43-1, ¶ 26.) The tailgate was down, and the bed of the truck was empty. (ECF No. 43-1, ¶ 26.) The Kia was parked on the side of the residence. (ECF No. 43-1, ¶ 26.) At about 9:40 AM, law enforcement conducted a traffic stop of the Dodge Ram and removed Coleman from the truck. (ECF No. 43-1, ¶ 27.)

Cooper stated that he believed Clayton was using the Kia in furtherance of drug trafficking and money laundering activities. (ECF No. 43-1, ¶ 29.) "On numerous occasions since September 23, 2020 case agents observed the [Kia] parked at 9736 West Tower Avenue Milwaukee Wisconsin … and at 6840 West Granville Circle Apartment 301 Milwaukee Wisconsin …. Case agents believe CLAYTON drives the [Kia] to these locations in furtherance of his drug trafficking and money laundering activities." (ECF No. 43-1, ¶ 29.)

### 5.2. Analysis of the Search Warrants

"To determine whether probable cause existed, the court must ask whether, 'based on the totality of the circumstances, the affidavit sets forth sufficient evidence to induce a reasonably prudent person to believe that a search will uncover evidence of a crime.'" *United States v. McMillian*, 786 F.3d 630, 639 (7th Cir. 2015) (quoting *United States v. Peck*, 317 F.3d 754, 756 (7th Cir. 2003)). "[A]ny court reviewing a decision to issue a warrant must 'ensure that the magistrate had a substantial basis for concluding that probable cause existed.'" *United States v. Pless*, 982 F.2d 1118, 1124 (7th Cir. 1992) (quoting *Gates*, 462 U.S. at 238).

As noted above, the delivery of a pallet first to a commercial parking lot followed by its immediate transport to a nearby home is suspicious and generally inconsistent with ordinary commercial practices. The measures Clayton employed in the transportation of the pallet reflect an attempt to conceal its final destination and are consistent with the pallet containing contraband.

Standing alone, this suspicious behavior would not add up to probable cause. But it does not stand alone. Cooper's affidavit also referenced a pallet destined for Milwaukee that was intercepted in Texas and contained 61 kilograms of cocaine. Although Clayton was not directly connected to that shipment, the affidavit outlines that he had a relationship with the identified recipient of that pallet. And Clayton was recorded picking up an earlier similar pallet that was shipped to the same destination. These facts support the inference that the March 16, 2021 pallet also contained controlled substances.

Bolstering this inference is Clayton's ownership of a home at which the execution of a search warrant uncovered modest amounts of controlled substances (more of which had apparently been flushed during the execution of the warrant) as well as over $12,000 in cash and about $40,000 in jewelry. Although Clayton now frames these facts as being wholly unrelated to the DEA investigation, a reasonable inference from the facts set forth in the affidavit is that the suspects in that investigation were distributors for Clayton. This conclusion is supported by the fact that Clayton implausibly purported to not know the name of his tenants or have any contact information for them. A reasonable inference

from these facts is that Clayton denied knowing the tenants in an effort to distance himself from them.

Clayton was also known to drive a car registered to, and to stay at the home of, a woman "identified as a drug trafficker" since at least 2010. (ECF No. 43-1, ¶ 17.) And the affidavit also references the fact that Clayton was previously convicted in federal court for conspiracy to distribute five kilograms of cocaine and money laundering.

Finally, the FBI tip referenced in Cooper's affidavit tends to corroborate the investigators' suspicions, although it is not especially probative given that the affidavit contains little information to establish the veracity of the tipster. *See United States v. Haynes*, 882 F.3d 662, 665 (7th Cir. 2018). Notably, in the affidavit the tipster appears to be anonymous.

Taken together, these facts were sufficient to establish probable cause to believe Clayton was involved in the distribution of large quantities of controlled substances. The inference that the pallet was delivered to the Tower Avenue residence established a strong connection between that property and Clayton's suspected criminality. Moreover, the affidavit notes the presence of external video surveillance, the fact that only Clayton and his vehicles had previously been seen at the property, and the fact that the blinds in the house remain closed, all of which support the inference that evidence of the distribution of controlled substances likely would be found inside. Finally, it is well-established and oft repeated that evidence of drug dealing is likely to be found in a drug dealer's home.

*United States v. Zamudio*, 909 F.3d 172, 176 (7th Cir. 2018); *Haynes*, 882 F.3d at 666. "The affidavit creates a fair probability that a drug dealer lived at the house, and thus that the house contained evidence of crime." *Haynes*, 882 F.3d at 666.

For many of the same reasons that evidence of drug dealing is likely to be found in a drug dealer's home, there is some reason to suspect that evidence of drug dealing is likely to be found in a drug dealer's car. But, more importantly, the fact that Clayton drove the Kia from the delivery of the pallet at the parking lot to his home makes it probable that evidence related to the distribution of controlled substances might be found in the Kia.

As for the Granville home, Clayton devotes much time to arguing that there is nothing in the affidavit connecting that property to alleged criminal activity. While Clayton relies on authority from other circuits (ECF No. 43 at 7-8), "[t]his circuit has consistently held that, for a search warrant, probable cause 'does not require direct evidence linking a crime to a particular place.'" *Zamudio*, 909 F.3d at 175 (quoting *United States v. Anderson*, 450 F.3d 294, 303 (7th Cir. 2006)). "Thus, an affidavit submitted in support of a warrant application 'need only contain facts that, given the nature of the evidence sought and the crime alleged, allow for a reasonable inference that there is a fair probability that evidence will be found in a particular place.'" *Id.* at 176 (quoting *United States v. Aljabari*, 626 F.3d 940, 944 (7th Cir. 2010)).

Clayton's argument also views the issue too narrowly in that it suggests that evidence is limited to what is immediately and objectively recognizable as suggestive of criminal activity. In a high-level drug investigation, for example, a wide variety of financial records might tend to support the investigation. These otherwise ordinary records that all persons acquire in their daily life may accumulate at any place a person spends significant time, including a home, car, or at his mother's home, especially given that his mother stated Clayton sometimes slept there and was known to store property there. The likelihood of finding evidence at the Granville home is enhanced by the fact that Clayton had spent the night of March 15-16 there, and it was shortly after he left that home on the morning of March 16 that he met the delivery of the pallet.

The court finds that, under the totality of the circumstances, probable cause supported the search of the Tower Avenue and Granville Circle residences as well as the Kia. Therefore, the court must recommend that the motion to suppress (ECF No. 43) be denied.

## 6. Conclusion

For the reasons set forth above,

**IT IS THEREFORE RECOMMENDED** that Coleman's "Motion to Suppress Results of Unlawful Stop" (ECF No. 29) be **denied**.

**IT IS FURTHER RECOMMENDED** that Coleman's "Motion to Suppress Results of Unlawful Arrest" (ECF No. 30) be **denied**.

**IT IS FURTHER RECOMMENDED** that Coleman's "Motion to Suppress Results of Unlawful Auto Search" (ECF No. 31) be **granted**.

**IT IS FURTHER RECOMMENDED** that Clayton's "Motion to Suppress Unlawful Arrest" (ECF No. 41) be **denied**.

**IT IS FURTHER RECOMMENDED** that Clayton's "Motion Unlawful Traffic Stop and Extension, Unlawful Vehicle Search" (ECF No. 42) be **granted.**

**IT IS FURTHER RECOMMENDED** that Clayton's "Motion to Suppress Warrant Lacked Probable Cause" (ECF No. 43) be **denied**.

**IT IS FURTHER ORDERED** that, in accordance with 28 U.S.C. § 636(b)(1)(B) and (C) and Fed. R. Crim. P. 59(b)(2), any written objection to any recommendation herein or part thereof shall be filed within fourteen days of service of this recommendation or prior to the Final Pretrial Conference, whichever is earlier. Failure to timely object waives a party's right to review.

Dated at Milwaukee, Wisconsin this 24th day of January, 2022.

WILLIAM E. DUFFIN
U.S. Magistrate Judge