# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
            **Plaintiff,**

**v.**                                                  **Case No. 21-CR-70**

**DWIGHT CLAYTON, et al.,**
            **Defendants.**

## DECISION AND ORDER

The government obtained an indictment charging Dwight Clayton, Jeffrey Coleman, and Kevin Mathis with drug trafficking, firearm, and money laundering offenses. Clayton and Coleman filed a number of pre-trial motions. Specifically, Coleman moved to suppress statements based on a <u>Miranda</u> violation (R. 28); the results of an unlawful stop (R. 29); the results of an unlawful arrest (R. 30); the results of an unlawful auto search (R. 31); and the results of an unlawful residence/garage search (R. 32). Coleman also moved to strike or suspend this district's jury plan. (R. 33.) Clayton moved to suppress evidence based on an unlawful arrest (R. 41); an unlawful traffic stop and vehicle search (R. 42); a deficient warrant (R. 43); and a <u>Miranda</u> violation (R. 44). Clayton also moved to join Coleman's jury plan challenge. (R. 45.) Mathis filed no motions, and the filing period has now closed.

The magistrate judge handling pre-trial proceedings addressed the Clayton and Coleman motions in three separate recommendations. Both sides have objected to various aspects of the magistrate judge's analysis. The district court reviews de novo recommendations on motions to suppress or dismiss. <u>See</u> Fed. R. Crim. P. 59(b). I address the recommendations in the order they issued.

**I.**

Clayton moved to suppress statements he made in response to custodial questioning during a traffic stop on January 27, 2021. (R. 44 at 1.) He indicated that following the stop he was removed from his vehicle and detained in a squad car while deputies searched his vehicle. (R. 44 at 1-2.) After the deputies located a bag of cash, they questioned Clayton about the money, without providing <u>Miranda</u> warnings, in response to which he made statements. (R. 44 at 2.)

Coleman moved to suppress custodial statements he made at the HIDTA offices on March 16, 2021, following his arrest earlier that day. (R. 28 at 1.) At no point following his arrest and prior to questioning did law enforcement advise Coleman of his <u>Miranda</u> rights. (R. 28 at 1-2.) Coleman also moved to suppress all physical evidence, observations, and other products of a sequence of unlawful seizures and searches following his March 16 arrest. (R 32 at 1.) Specifically, he argued that law enforcement officers unlawfully seized a garage door opener; they then used the device to open the garage door at an apartment building in Greendale, Wisconsin, observing a motorcycle they determined belonged to Coleman; and, finally, they used the information learned in the garage search to obtain a search warrant for an apartment in the Greendale building, seizing during the subsequent search jewelry and watches that allegedly belonged to Coleman. (R. 32 at 1-3.)

In response, the government essentially conceded these motions. Specifically, the government agreed that Clayton was not advised of his <u>Miranda</u> rights prior to custodial questioning during the traffic stop on January 27, 2021. "Therefore, the government will not use or attempt to introduce any of the oral statements or non-verbal assertions made by Dwight Clayton during his traffic stop by the Milwaukee County Sheriff's Department on January 27,

2021 in the government's case in chief at any subsequent trial." (R. 49 at 1.) Similarly, with respect to Coleman's motion to suppress statements, the government agreed that Coleman was not advised of his Miranda rights prior to custodial questioning after his arrest on March 16, 2021. "Therefore, the government will not use or attempt to introduce any of the oral statements or non-verbal assertions made by Jeffrey Coleman during his processing at the Milwaukee HIDTA office in Milwaukee on March 16, 2021 in the government's case in chief at any subsequent trial." (R. 51 at 1.) The government also agreed that "irregularities occurred during the preparation of the state search warrant for the Greendale apartment. Therefore, the government will not use or attempt to introduce any evidence seized during the search of that property in the government's case in chief at any subsequent trial." (R. 52 at 1.)

Based on the government's concessions, the magistrate judge recommended that these three motions be dismissed as moot. (R. 54 at 3-4.) Clayton has not objected. Coleman has objected, arguing that the court should hold the motions in abeyance or grant them as unopposed. Otherwise, he worries the defense will have to renew the motions if the government acts inconsistently with its concessions. "Further, as to the search of the Greendale apartment, the Government's concession does not match the scope of Coleman's motion. [T]he Government should expand its concession to any observations by officers made at the apartment, including things seen and overheard. Without that expansion, the motion seeks relief that the government's concession does not afford." (R. 57 at 2.)

The government has not responded to Coleman's objection. It is thus unclear whether the government intends to introduce other observations made at the Greendale apartment building. I will accordingly hold that motion (R. 32) in abeyance and inquire about the issue at the May 4, 2022, status hearing. I will find Clayton and Coleman's Miranda motions (R. 44, 28)

3

moot, on the understanding that the government will act consistently with its concessions.

## II.

Coleman moved to dismiss the indictment without prejudice and suspend operation of this district's jury plan for assembling a master jury wheel, a qualified panel, and pools for grand juries and petit juries. (R. 33 at 1.) Clayton moved to join and adopt the motion (R. 45), which the magistrate judge allowed (R. 58 at 10).

Coleman argued that the plan systematically excludes non-white minorities by relying on lists of actual voters, rather than registered voters; by including an opt-out provision for single parents; and by requiring extra steps for prospective jurors without reliable internet access. (R. 33 at 2-3.) According to the district's 2019 report, racial and ethnic minorities represented only 9.44% of the qualified panel for the Milwaukee Division, while census data indicate minorities comprise 21.8% of the voting age population. (R. 33 at 4.) Coleman relied on an expert opinion obtained in a previous case suggesting the Milwaukee division's under-representation of minorities was 7.3% to 8.4% and non-Hispanic whites were over-represented by about 5.6%. (R. 33 at 6; R. 33-1 at 2-3.) He requested a hearing to present evidence based on updated figures. (R. 33 at 8.)

The magistrate judge denied the request for a hearing and recommended the motion be denied for failure to establish a prima facie case under <u>Duren v. Missouri</u>, 439 U.S. 357 (1979), which holds that:

> In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

4

Id. at 364.[1]  The magistrate judge first noted that courts have rejected the notion that all non-white populations may be lumped together (as Coleman had done) or that all non-whites are a "distinctive group."  (R. 58 at 6, collecting cases.)  Second, the magistrate judge noted that, under Seventh Circuit precedent, a discrepancy of less than 10% is not enough to demonstrate unfair or unreasonable representation.  (R. 58 at 7, citing United States v. Phillips, 239 F.3d 829, 842 (7th Cir. 2001).)  The judge further noted that Coleman's figures failed to account for factors that may render voting age persons ineligible for jury service, such as lack of citizenship, lack of English proficiency, or having been convicted of a felony and not having rights restored.  (R. 58 at 8, citing 28 U.S.C. § 1865(b).)  Finally, the magistrate judge noted that, to the extent Coleman argued the plan's decision to use actual voters resulted in systemic exclusion, the Jury Selection and Service Act explicitly authorizes the use of lists of actual voters.  (R. 58 at 9, citing 28 U.S.C. § 1863(b)(2).)

Coleman objects and requests a hearing, arguing that the magistrate judge conflated the standard for gaining the chance to offer evidence with the prima facie showing required once that evidence is offered.  (R. 62 at 5.)  He notes that since the filing of his motion new census data has been released, and if the court grants a hearing the parties' experts can use those more current figures.  (R. 62 at 7.)  He presents a supplemental affidavit from Prof.

---

[1]"The demonstration of a prima facie fair-cross-section violation by the defendant is not the end of the inquiry into whether a constitutional violation has occurred.  We have explained that States remain free to prescribe relevant qualifications for their jurors and to provide reasonable exemptions so long as it may be fairly said that the jury lists or panels are representative of the community.  However, we cautioned that [the] right to a proper jury cannot be overcome on merely rational grounds.  Rather, it requires that a significant state interest be manifestly and primarily advanced by those aspects of the jury-selection process, such as exemption criteria, that result in the disproportionate exclusion of a distinctive group."  Id. at 367-68 (internal citations and quote marks omitted).

Kenneth Mayer asserting that whites are now over-represented by more than 12%. (R. 62 at 8; R. 63 at 2-3 ¶ 4.)

Turning to the magistrate judge's analysis, Coleman concedes that courts have rejected the notion that all racial or ethnic minorities can be lumped together as a distinctive group. (R. 62 at 9.) However, he contends that courts have treated the issue as a purely legal question, overlooking sociological studies documenting many shared experiences and commonalities across racial and ethnic minority groups. (R. 62 at 10-11; <u>see</u> R. 64 at 2-8, affidavit of Joe R. Feagin, Ph.D.) "The immediate question is whether, on balance, the constitutional interest of a fair cross-section of the community and equal access to jury service means that the shared interests of minority groups collectively outweigh their differences or distinctions in this context." (R. 62 at 14.) Coleman asserts the question is good material for an evidentiary hearing, expert testimony, and post-hearing briefing. (R. 62 at 15.)

Coleman further criticizes the magistrate judge's reliance on the 10% benchmark, which resulted in the judge overlooking evidence of intentional discrimination. He first notes that under-representation of a distinctive group under the absolute disparity test could never be shown where the total population of the particular group is under 10% of the citizenry. (R. 62 at 15.) The absolute disparity test is used for fair cross-section claims under the Sixth Amendment, which usually rest on disparate impact, but the Fifth and Fourteenth Amendments tolerate no deliberate racial discrimination in composing master jury wheels, qualified panels, or juries. (R. 62 at 16.)

Coleman questions the plan's link between voter participation and eligibility to serve on a grand or petit jury. (R. 62 at 17.) He concedes that the statute permits reliance on actual voter lists but notes that the law was written decades ago, before the Supreme Court cut back

6

on the coverage of the Voting Rights Act. He further notes that the statute requires a jury plan assure that each county in the district is substantially proportionally represented, which this district's plan does not do, instead apportioning on the basis of voter turnout in a county. (R. 62 at 18.) He notes that voter turnout is higher in heavily white counties like Waukesha than in more diverse Milwaukee County. "So the illogical linkage between jury service and whether one's fellow county residents are voting begs a question of intent. Coleman knows of no readily apparent rational basis for using voter turnout as the basis for apportioning the master jury wheel across the division's counties." (R. 62 at 19.) He further notes that the district's reports show steadily declining minority participation. (R. 62 at 19-20.) He concludes: "None of this means that the Court necessarily will have to draw an inference of discriminatory intent. But that is what evidentiary hearings are for. This one will have the benefit of fresh U.S. Census numbers that were not released until weeks after Coleman filed his motion." (R. 62 at 20.)

Coleman also questions the magistrate judge's reliance on the absolute disparity test, given the Supreme Court's decision in Berghuis v. Smith, 559 U.S. 314 (2010), which noted the test's imperfection. (R. 62 at 20-21.) He contends that, unless the court grants a hearing and makes findings based on a complete record, the Seventh Circuit never will get a chance to consider how, if at all, Berghuis requires it to reassess its standard for such claims. (R. 62 at 23.)

Finally, Coleman faults the magistrate judge for failing to address the problem of white over-representation. (R. 62 at 23-24.) The net effect is the same, regardless of how one frames the calculation. (R. 62 at 25.)

In response, the government first notes that Coleman raises the same arguments, based

7

on the same evidence, as a motion rejected by a different branch of the court in 2019.  (R. 75 at 3, citing United States v. Ganos, No. 18-CR-62, ecf # 116 (Mar. 12, 2019) (magistrate judge order), ecf # 192 (June 14, 2019) (district judge order).)  Turning to the magistrate judge's analysis, the government argues that the motion fails at the first step of the Duren test.[2]  While Coleman now presents an affidavit from Prof. Feagin, who opines that minority groups "share many racial interests, experiences, historical burdens, and ongoing difficulties in life" (R. 74 at 7 ¶ 10), Prof. Feagin concedes that he "cannot opine on whether Black, Latino, Asian, and Native Americans are or should be viewed collectively as one distinctive group as a legal matter."  (R. 74 at 7 ¶ 9.)  The government argues that any additional testimony from Prof. Feagin would not support a finding that all non-whites are a distinctive group, a contention consistently rejected by federal courts.  (R. 75 at 4.)  Coleman cites no authority to the contrary.  (R. 75 at 5.)

The government further notes that Coleman relies on statistical evidence which is limited to Milwaukee County and does not account for citizenship or voting status.  (R. 75 at 5, citing United States v. Alanis, 265 F.3d 576, 583 (7th Cir. 2001) ("In the South Bend Division of the Northern District of Indiana, jury venires are drawn from eleven counties, yet Alanis only presented statistical evidence about the racial composition of St. Joseph County, the county in which the district court was located.  Without evidence about the total representation of Blacks and Hispanics in the community from which the venire was drawn, there is no way to determine whether the representation in the venire was not fair and reasonable.").)

---

[2]See United States v. Raszkiewicz, 169 F.3d 459, 463 (7th Cir. 1999) ("The elements of the test are: (1) the existence of qualities that define a group, (2) similarity of attitudes, beliefs, or experiences, and (3) a community of interest among group members.").

The government argues that in an attempt to skirt the problem created by his failure to identify a "distinctive" group excluded from jury service, Coleman attempts to re-frame his argument as one that whites are over-represented. However, he cites no authority in support of his position, and courts have consistently analyzed fair cross-section claims in terms of under-representation and exclusion. (R. 75 at 6, citing, e.g., Kotler v. Woods, 620 F. Supp. 2d 366, 399 (E.D.N.Y. 2009) ("Moreover, petitioner's challenge on the grounds that a certain group was over-represented in the jury panel fails as a matter of law, because over-representation of a group does not implicate the Sixth or Fourteenth Amendment. This novel argument presented by petitioner is without a legal basis.").)

In response to Coleman's argument that a hearing is needed so his expert can use more recent census data, the government worries that use of 2020 census data to measure the white population may not be accurate, noting that the Census Bureau has warned users that because of changes to how the race question was asked, comparisons to the 2010 numbers "should be made with caution." (R. 75 at 7.) The government contends that some of the Bureau's changes for the 2020 census may have increased the number of people identifying as white. (R. 75 at 8.)

Turning to the second element, the government notes that Coleman's expert asserts collective minority under-representation of 7.3% to 8.4%, below the 10% threshold endorsed by the Seventh Circuit. (R. 75 at 8-9.) While Coleman speculates that the absolute disparity may be greater now, he does not provide any estimate that accounts for citizenship and voting status, nor any for the numerical under-representation of any specific distinctive group. (R. 75 at 9.) Coleman suggests that Berguis casts doubt on the absolute disparity test, but the Supreme Court declined to adopt any particular test, and no subsequent Seventh Circuit

9

authority has condemned its use.  (R. 75 at 9-11.)  Even if <u>Berghuis</u> does undermine the absolute disparity test, Coleman fails to proffer evidence showing under-representation under any alternate test.  (R. 75 at 11.)  A promise to present evidence under an alternate theory at a future evidentiary hearing is, the government contends, insufficient.  (R. 75 at 12.)

As to the third element—systemic exclusion—Coleman relies primarily on the plan's use of actual voter lists, but the government responds that this facially neutral mechanism—one endorsed by the Jury Selection and Service Act—is unlikely to demonstrate systemic exclusion. (R. 75 at 12.)  The government notes that the Seventh Circuit has upheld the use of voter lists pursuant to an authorized plan, even when it resulted in the absence of  African-Americans from the venire.  (R. 75 at 13, citing <u>United States v. Neighbors</u>, 590 F.3d 485, 491-92 (7th Cir. 2009); <u>United States v. Guy</u>, 924 F.2d 702, 706 (7th Cir. 1991).)  Coleman also cites the plan's opt-out for single parents, but the <u>Duren</u> Court suggested such an exemption would pass muster.  439 U.S. at 370 ("We recognize that a State may have an important interest in assuring that those members of the family responsible for the care of children are available to do so.  An exemption appropriately tailored to this interest would, we think, survive a fair-cross-section challenge.").

To the extent Coleman also raises equal protection and statutory claims, the government contends those claims also fail.  (R. 75 at 14.)

> [I]n order to show that an equal protection violation has occurred in the context of grand jury selection, the defendant must show that the procedure employed resulted in substantial underrepresentation of his race or of the identifiable group to which he belongs.  The first step is to establish that the group is one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied.  Next, the degree of underrepresentation must be proved, by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors, over a significant period of time. . . . Finally, . . . a selection procedure that is susceptible of abuse or is not racially neutral

10

> supports the presumption of discrimination raised by the statistical showing. Once the defendant has shown substantial under representation of his group, he has made out a prima facie case of discriminatory purpose, and the burden then shifts to the State to rebut that case.

Castaneda v. Partida, 430 U.S. 482, 494-95 (1977) (internal citations and quote marks omitted). The government notes that the first two prongs of this test mirror the first two prongs of the Duren cross-section test, and because Coleman failed to identify a distinctive group that was substantially under-represented, he has also failed to make a prima case of an equal protection violation. (R. 74 at 14-15.) Nor does he offer evidence of discriminatory intent, pointing instead to the use of voter records, which cannot support such an inference and the use of which was upheld in Ganos, undermining any claim that the district's failure to amend its procedures since that litigation was problematic. (R. 75 at 15.) Coleman's motion also invokes the Jury Selection and Service Act, but the test under the statute is the same as under the Sixth Amendment. (R. 75 at 15, citing Raszkiewicz, 169 F.3d at 462 n.1.)

Finally, the government contends that Coleman is not entitled to an evidentiary hearing since he would not be entitled to legal relief even if all of the facts he proffers are true. To the extent he alludes to additional facts he might be able to prove at a hearing, a promise of future evidence is, as the court noted in Ganos, insufficient to establish a prima facie case. (R. 75 at 16.)

In reply, Coleman argues that to the extent the 2020 census data may under-count or over-count whites, and the relationship of the current numbers to the 2010 data, that is the stuff of an evidentiary hearing. (R. 74 at 3.) He contends that the government has given a good example of why he has made a prima facie showing for an evidentiary hearing. (R. 76 at 3-4.)

I will address this motion with the parties at the May 4, 2022 status. First, the parties

11

should be prepared to discuss how, if at all, an evidentiary hearing might assist the court in addressing the first element of the <u>Duren</u> test. Important as the issues discussed in Prof. Feagin's affidavit are for society, they are not ordinarily the subject of evidentiary hearings in district courts. The parties should also be prepared to discuss whether additional affidavits discussing 2020 census data should be obtained prior to or in anticipation of a possible hearing. Finally, the parties should be prepared to address the issue of remedy. Should the court find this district's current plan unconstitutional, what list of potential jurors could be consulted to produce a different result?

### III.

The magistrate judge issued a comprehensive 49-page recommendation on the remaining suppression motions. I adopt the magistrate judge's recitation of the background facts.[3] I present an abbreviated version of the facts pertinent to each motion in this order. I first address Clayton's motions, then Coleman's.

### A.    Clayton's Motions

#### 1.    Traffic Stop and Vehicle Search

On January 27, 2021, Milwaukee County Sheriff's Deputy Montrel Hobbs, acting at the request of task force officer Matthew Cooper, pulled Clayton over, purportedly for speeding and deviating from his lane. Hobbs questioned Clayton about guns and drugs, detained Clayton while he summoned a drug sniffing dog, and after the dog failed to alert decided to impound

---

[3]In his objections, Coleman agrees that most of the magistrate judge's factual findings are accurate, noting a few instances where the judge allegedly erred or omitted important details. (R. 101 at 4.) I address these disputes below. Clayton disagrees with the magistrate judge's conclusions, but he does not dispute the facts set forth in the recommendation. Nor does the government.

12

Clayton's vehicle for illegal window tint. Based on the decision to impound the vehicle Hobbs conducted an "inventory search" pursuant to which he located a backpack containing $149,000 in cash. (R. 42 at 2-4.) The encounter lasted about 75 minutes before the vehicle was towed and Clayton was dropped off at a gas station. (R. 42 at 4.)

Clayton moved to suppress, arguing that the stop was pre-textual at its inception (R. 42 at 5), that Hobbs unlawfully extended the stop beyond its permissible scope and duration (R. 42 at 7), and that Hobbs unlawfully seized and searched the vehicle (R. 42 at 10). Clayton conceded that Whren v. United States, 517 U.S. 806 (1996), foreclosed his first contention. (R. 42 at 6.) However, he argued that Hobbs unlawfully extended the stop by 30-40 minutes for the dog sniff, see Rodriguez v. United States, 575 U.S. 348, 357 (2015) (finding that a dog sniff prolonging a traffic stop violates the Fourth Amendment) (R. 42 at 7-9); that Hobbs had no grounds to impound the car, see United States v. Cartwright, 630 F.3d 610, 614 (7th Cir. 2010) (noting that the decision to impound is properly analyzed as distinct from the decision to inventory); United States v. Duguay, 93 F.3d 346, 352 (7th Cir. 1996) ("An impoundment must either be supported by probable cause, or be consistent with the police role as 'caretaker' of the streets and completely unrelated to an ongoing criminal investigation.") (R. 42 at 10-12); and that the search was invalid because it was not done pursuant to standard procedures, see Cartwright, 630 F.3d at 614 (noting that an inventory search is lawful if, inter alia, it is "conducted as part of the routine procedure incident to incarcerating an arrested person and in accordance with established inventory procedures") (R. 42 at 12-15).

The magistrate judge held a hearing on the motion, at which Hobbs testified that Cooper asked him to find a reason to pull Clayton over if he saw it and to then see if he could find a reason to search the car and find the money Cooper believed it contained. Hobbs pulled

13

Clayton over for speeding and noticed that the windshield was tinted below the "AVIS" line, based on which Hobbs decided to impound the vehicle. While the Sheriff's Office does not have a policy regarding towing vehicles with illegal window tint, Hobbs testified that he had towed vehicles at least 25 times for this reason. (R. 97 at 8.) Hobbs checked Clayton's criminal history, learning that he had a record of drug offenses, and requested a dog be brought to the scene. The dog arrived in about 30 minutes and went around the car but did not detect drugs. Hobbs then conducted an inventory search in preparation for towing, finding a backpack containing a large amount of cash, which he later turned over to the DEA. Hobbs did not create a written inventory of what he found in the car. He issued Clayton several traffic citations and dropped Clayton off where he requested. Clayton picked the car up from the impound lot a few days later. (R. 97 at 9.)

The magistrate judge concluded that the search could not be upheld as an inventory search, noting that in this context motive matters. See Whren, 517 U.S. at 812 (noting that an officer's motive may invalidate objectively justifiable behavior in the context of an inventory search); Florida v. Wells, 495 U.S. 1, 4 (1990) ("[A]n inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence.").

> It is implausible that, but for Hobbs's desire to find a means to search the vehicle, he would have decided to tow the car and thus conduct an inventory search. Hobbs's testimony that the vehicle was unsafe to drive was not credible. As described to the court, the violation that allegedly made the vehicle unsafe to drive was exceedingly minor: some degree of tint somewhat below the point where tint is permitted on a windshield. It was so minor, in fact, that Clayton was allowed to retrieve his vehicle from the tow lot in short order and drive it away in the same purportedly unsafe condition.

(R. 97 at 11-12.) The magistrate judge further noted that the decision to tow was made only after the dog failed to alert to the vehicle. "If Hobbs had immediately concluded that the vehicle

14

was unsafe and that he was going to tow it and conduct an inventory search, it makes little sense to call for a dog to sniff the vehicle. . . . At a minimum, the court would expect that Hobbs would have conducted his inventory search while he waited for the dog, but he did not." (R. 97 at 12.)

> Based on the video of the traffic stop, Hobbs did not request a tow truck until 8:09 PM, which was about 50 minutes after he allegedly first noticed the tinted windshield and made the decision to tow the truck, about 15 minutes after the dog went around the truck without alerting, and ten minutes after he searched the truck and found the money. Hobbs never mentioned the tinted windows to Clayton until after the search. And when he did say something to Clayton, the discussion that resulted reveals why such a discussion should have preceded any decision to tow the truck or conduct an inventory search. Clayton explained that he obtained the truck from the dealership with the windshield tinted, which means the tint might not have been unlawful, see Wis. Admin. § Trans. 305.34(6)(b) (stating that prohibition on anything "placed or suspended in or on the vehicle or windshield so as to obstruct the driver's clear vision through the windshield" does not apply to "[w]indshields tinted by the manufacturer of the glazing and installed as part of the original manufacturing process"). Taken together, the timing of Hobbs's actions tends to support the conclusion that, but for the discovery of the money and the need to rationalize his search, Hobbs had no intention of towing the truck.

(R. 97 at 13-14.)

Finally, the magistrate judge noted that the government provided no details of the other occasions in which Hobbs towed vehicles for window tint. (R. 97 at 14.) Nor did Hobbs prepare an actual inventory of the search, despite seizing nearly $150,000. (R. 97 at 14-15.)

The magistrate judge also rejected the government's argument that probable cause existed to search the vehicle under the automobile exception. While the DEA had been investigating Clayton for some time, Hobbs did not know the details of that investigation. (R. 97 at 15.) Nor did Cooper instruct Hobbs to stop and search Clayton's vehicle based on what Cooper knew. Rather, Hobbs testified that Cooper told him to find a reason for the stop: "Once I pulled the vehicle over, it was basically a make-your-own case." (R. 93 at 7.) The

15

magistrate judge rejected the government's characterization that this was simply a request for Hobbs to find a cover story so as not to alert Clayton to the investigation. (R. 97 at 17-18.) There would have been no need to maintain the pretense of an inventory search at the evidentiary hearing, the judge noted, if it had really all been a ruse. (R. 97 at 18.) The magistrate judge thus rejected use of the collective knowledge doctrine to justify the search and recommended the motion be granted. (R. 97 at 20-21.)

The government has not objected to this recommendation. Because such recommendations are not self-executing, I have independently reviewed the matter and agree with the magistrate judge's analysis. Clayton's motion to suppress/unlawful traffic stop (R. 42) will be granted.

### 2. Arrest

The investigation continued after the January 2021 stop, culminating in Clayton's warrantless arrest on March 26, 2021. Clayton moved to suppress the evidence obtained as a result of that arrest. (R. 41 at 1-2.) Agents had previously obtained warrants to track Clayton's vehicle and cell phone location based on several pieces of information: an online tip that Clayton co-owned a business (S&C Trucking) used to launder drug proceeds, an unrelated investigation out of Texas pursuant to which agents seized 61 kilograms of cocaine from a pallet slated to be shipped to an associate of Clayton's in Milwaukee, and a search of a property Clayton owned and leased to another person pursuant to which law enforcement recovered drugs, money, and jewelry. (R. 41 at 2-4.) Agents obtained extensions of the warrants and later added Clayton's second vehicle to their monitoring. (R. 41 at 5.) Law enforcement had located Clayton using the trackers prior to the January 2021 traffic stop. (R. 41 at 6.)

16

On March 16, 2021, agents conducting surveillance of a lot where S&C Trucking parked some of its vehicles observed Clayton and Coleman help an unknown third man load a plastic-wrapped pallet onto the bed of a truck driven by Coleman. Agents later located the truck backed into the driveway at Clayton's suspected stash house, the pallet no longer in the back. (R. 41 at 7.) Agent stopped Coleman and Clayton as they drove away, in separate vehicles. They arrested Clayton, seizing a phone and his house keys.[4] (R. 41 at 8.) Agents then returned to Clayton's home for a protective sweep, observing a pallet similar to the one seen in Coleman's truck earlier that day, before applying for a warrant for the home (as well as the vehicle Clayton was driving). (R. 41 at 8-9.) A subsequent search of the home turned up a two kilograms of cocaine, a firearm, a money counter, and packaging materials. (R. 41 at 9.)

Clayton moved to suppress, arguing that the agents arrested him without probable cause. (R. 41 at 10.) He argued that the agents observed no law violations in the months prior to March 16, and their observation of the pallet on that date failed to incriminate him. (R. 42 at 10-11.) Although agents suspected the pallet contained drugs based on the seizure in Texas five months earlier, nothing linked the pallet seen on March 16 to that earlier seizure; nor did the agents possess other evidence suggesting the pallet contained drugs. (R. 42 at 11.)

The magistrate judge held a hearing on this motion as well, discussing the results of the investigation prior to March 16, including Clayton's delivery of nearly $150,000 in cash to an undercover officer. (R. 97 at 21-25.) Because the record lacked additional details regarding the purpose of that transaction, the magistrate judge declined to rely on that delivery alone as

---

[4]As discussed below, agents also searched Coleman's truck at that time. The magistrate judge recommends Coleman's motion challenging that search be granted.

a basis for probable cause. (R. 97 at 25.) Nevertheless, the record demonstrated a pattern of incidents strongly suggesting Clayton's involvement in money laundering, including Mathis's three trips to Milwaukee in early 2021, during which he would meet with Clayton and then make large cash deposits at a local bank. While these facts might not support proof beyond a reasonable doubt, the magistrate judge found that they established probable cause of money laundering. (R. 97 at 26.)

> Because the laundering of cash suggests that the source of that cash is illicit, the fact that a person is engaged in the laundering of cash tends to suggest that the person is acquiring income through some unlawful means. Clayton's money laundering activity, his connection to the owner of a business that was to receive a pallet that was found to contain 61 kilograms of cocaine, the fact that Clayton was observed picking up a very similar pallet, the informant's tip, Clayton's prior federal drug conviction, and other facts, all add up to probable cause to believe that Clayton had violated federal controlled substances laws.

(R. 97 at 27.) Clayton argued that this information was stale, but the magistrate judge noted that staleness was a term generally reserved for searches.[5] "Aside from the statute of limitations for the underlying crime, probable cause to arrest does not have an expiration date. Thus, the court easily finds that probable cause existed to arrest Clayton when he was stopped and arrested on March 16, 2021." (R. 97 at 27-28.) Finally, the magistrate judge concluded that, having lawfully arrested Clayton, the officers were permitted to search him incident thereto, recovering the house key. Clayton argued that the agents subsequent entry into the house was illegal, but for the reasons set forth later in his report the magistrate judge concluded that the agents' observations, included in the warrant application for the property,

---

[5]See United States v. Haldorson, 941 F.3d 284, 292 (7th Cir. 2019) ("It is the rare case where 'staleness' will be relevant to the legality of a warrantless arrest. When there is a reasonable belief that someone has committed a crime, time by itself does not make the existence of that fact any less probable.") (footnote omitted).

18

were immaterial to whether probable cause existed to search the property. He thus found it unnecessary to determine whether the agents' warrantless entry into the home was unlawful. (R. 97 at 28.)

Clayton objects (R. 103 at 1), arguing that the information known to law enforcement on March 16, 2021, at most created reasonable suspicion (R. 103 at 2). It fell short of probable cause because at no point had law enforcement observed Clayton possessing any drugs or breaking any laws. (R. 103 at 2.)

For a warrantless arrest to be reasonable, the police must have probable cause, which exists if, given the facts and circumstances within their knowledge at the time of arrest, the officers reasonably believed that the suspect had committed or was committing a crime. United States v. Funches, 327 F.3d 582, 586 (7th Cir. 2003). Determinations of probable cause are naturally based on probabilities, and a finding of probable cause does not require evidence sufficient to support a conviction, nor even evidence demonstrating that it is more likely than not that the suspect committed a crime. Id. In making probable cause determinations, law enforcement officers are entitled to draw reasonable inferences from the facts before them, based on their training and experience. Id.

I agree with the magistrate judge that the agents had probable cause to arrest Clayton on March 16, 2021. The agents had by that point gathered a significant amount of evidence from a variety of sources, detailed above and in the recommendation, including the informant's tip, surveillance, undercover work, and previous seizures of contraband, suggesting Clayton's involvement in money laundering and drug trafficking. After observing the unusual delivery of the pallet on March 16, the agents were justified in stopping and arresting Clayton.

In his objections, Clayton challenges each piece of evidence cited by the magistrate

19

judge. (R. 103 at 2.) However, probable cause is evaluated based on the totality of the circumstances, rather than viewing bits and pieces of evidence in isolation. <u>See</u> <u>United States v. Lloyd</u>, 71 F.3d 1256, 1262-63 (7th Cir. 1995). No single piece of evidence need be conclusive. <u>See</u> <u>United States v. Marin</u>, 761 F.2d 426, 431 (7th Cir. 1985). And "[e]ven otherwise innocent behavior can arouse suspicion in light of other circumstances." <u>United States v. Markling</u>, 7 F.3d 1309, 1317 (7th Cir. 1993).

Clayton first objects to the magistrate judge's reliance on his cash delivery to the undercover agent and his interactions with Mathis before Mathis made cash deposits. Clayton notes that transferring or depositing cash is not a crime, and no direct evidence was adduced linking these funds to criminal activity. (R. 103 at 3.) However, these activities must be considered in context: Clayton has a previous federal conviction for drug trafficking and money laundering; agents linked Clayton to an Illinois suspect under investigation for money laundering (R. 97 at 2-3); Clayton delivered a quantity of bulk currency to an undercover officer (R. 97 at 4); agents received an online tip that Clayton was involved in money laundering using his trucking business (R. 97 at 4); and agents then linked Clayton to Mathis, who had a pattern of traveling to numerous cities in different states, meeting with suspected drug traffickers, depositing large amounts of cash, then leaving the city (R. 97 at 7).

Clayton next contends that his mere association with the purported recipient of the pallet containing kilograms of cocaine adds nothing to probable cause. (R. 103 at 4.) But agents did not rely on association alone; they learned of three similar shipments from Texas within the preceding two month period, and Clayton was seen on surveillance video arriving and leaving with a pallet in his truck (in August 2020). (R. 97 at 5-6.) Clayton notes that the August 2020 pallet was never found to contain contraband, and since he owns a shipping business it is

unsurprising that he was seen transporting a pallet. (R. 103 at 5.) But as the magistrate judge noted:

> [I]nvestigators had multiple reasons to doubt the legitimacy of Clayton's trucking business. Aside from the informant's tip that the business was a front for money laundering, three of Clayton's trucks "basically never moved and one or two would sporadically move." (ECF No. 93 at 180.) And, despite frequent surveillance, there was no evidence that either Clayton or Coleman was engaged in a legitimate business of transporting pallets of products. To the contrary, there was only a single instance of either having been observed transporting such a pallet, and that was when Clayton was recorded picking up a pallet that was shipped from Texas that was essentially the same as the one that had been found to contain 61 kilograms of cocaine. From these facts and the strong evidence that Clayton was involved in laundering very large sums of money, it was reasonable for investigators to infer that Clayton was receiving large quantities of controlled substances that were shipped to him in pallet form.

(R. 97 at 32.)

Clayton argues that no evidence links the March 2021 pallet to the Texas warehouse pallet seized five months earlier. He further notes that the March 2021 pallet was smaller in size and wrapped differently than the Texas pallet.[6] (R. 103 at 6.) But this overlooks the unusual manner in which the pallet was delivered to Clayton's business parking lot, transferred to a different vehicle, and then driven to Clayton's home. As the magistrate judge noted, "Had this been an innocent delivery, the commercially reasonable approach would have been to have the delivery made directly to Clayton's home." (R. 97 at 33.) Clayton contends that nothing in the record suggests this practice is uncommon or indicative of crime. (R. 103 at 7.)

---

[6]Clayton takes issue with the magistrate judge's finding that it is not surprising the organization made changes after the seizure of the 61 kilograms. He contends that the government did not advance such an argument, nor did any law enforcement officer who testified. (R. 103 at 6.) At the hearing, Cooper testified: "Drug dealers will occasionally change up their methods of shipment or trafficking. Especially after a load is lost in shipment they would be -- very unlikely for them to use the same shipping method and locations after losing a load in shipment." (R. 93 at 171:17-21.)

21

But in the context of this long-term investigation, the agents could have drawn a different inference. See Funches, 327 F.3d at 587 ("These actions taken together are difficult to explain as an innocent exchange, but quite easily understood, especially when observed by experienced narcotics officers, as a common method of conducting a drug deal.").

Clayton next contends that the informant's tip offers little to support his arrest. (R. 103 at 7.) As discussed above, however, the agents gathered significant corroborating information. Clayton similarly argues that his prior conviction, standing alone, adds nothing. (R. 103 at 8.) But the agents could consider Clayton's prior drug trafficking and money laundering convictions—and renewed association with Coleman, his co-defendant in that prior case—in assessing Clayton's conduct during this investigation.

Finally, Clayton argues that the September 2020 drug seizure at his rental property provides no support for his March 2021 arrest. (R. 103 at 8.) Again, standing alone, this evidence seems insignificant. But as the magistrate judge noted later in his report:

> Although Clayton now frames these facts as being wholly unrelated to the DEA investigation, a reasonable inference from the facts set forth in the affidavit is that the suspects in that investigation were distributors for Clayton. This conclusion is supported by the fact that Clayton implausibly purported to not know the name of his tenants or have any contact information for them. A reasonable inference from these facts is that Clayton denied knowing the tenants in an effort to distance himself from them.

(R. 97 at 45-46.)

For these reasons and those stated in the magistrate judge's recommendation, Clayton's motion to suppress evidence acquired as a result of his arrest (R. 41) will be denied.

### 3. Warrant

Clayton also moved to suppress the evidence gathered in searches pursuant to a warrant of two residences (on Tower Ave. and Granville Circle) and his vehicle (a Kia Optima).

22

(R. 43 at 1.) Summarized, the warrant application relied on the August 2020 anonymous tip that Clayton was using his trucking company (S&C Trucking) to launder drug money; the September 2020 search of the property Clayton owned and leased to another person, pursuant to which law enforcement recovered drugs, cash, and jewelry; the October 2020 seizure of kilograms of cocaine from the Texas warehouse on a pallet addressed to an associate of Clayton's in Milwaukee; the results of the tracking of Clayton's phone; and the agents' observation of the pallet delivery on March 16, 2021. (R. 43 at 2-4.) The affidavit also included the agents' observation of the pallet inside the residence during the protective sweep. (R. 43 at 5.) As indicated above, the warrant issued and during the subsequent search agents recovered drugs, packaging materials, a rifle and ammunition, and a money counter from the Tower Ave. home. (R. 43 at 5.)

Clayton challenged the probable cause determination, arguing that the affidavit failed to establish a nexus between the Granville address and any criminal activity (R. 43 at 6-8); that the affidavit relied on tainted evidence, including the observation of the pallet inside the Tower property during the protective sweep, the recovery of cash during the January 2021 traffic stop, and the recovery of contraband from the unlawful search of Coleman's truck (R. 43 at 9-13); and that the remaining information failed to establish probable cause (R. 43 at 13-16). He further argued that the good faith exception did not apply given the application's reliance on tainted evidence. (R. 43 at 16-17.)

The magistrate judge recommended that the motion be denied. The judge limited his analysis to the four corners of the affidavit and disregarded the facts unlawfully obtained (e.g., from the January 2021 traffic stop, the March 2021 protective sweep, and the March 2021 search of Coleman's truck). (R. 97 at 39-40.) Reviewing the remaining content of the affidavit

23

(R. 97 at 40-44), the magistrate judge highlighted the suspicious March 16 delivery of the pallet first to a commercial parking lot then a nearby home, the previous seizure of a pallet containing 61 kilograms of cocaine in Texas addressed to an associate of Clayton's in Milwaukee, surveillance showing Clayton picking up an earlier similar pallet shipped to that same destination, Clayton's ownership of a home from which drugs and cash had been seized (with Clayton implausibly claiming not to know the tenants), Clayton's previous federal drug trafficking and money laundering convictions, and the FBI tip (R. 97 at 45-46). The magistrate judge concluded:

> Taken together, these facts were sufficient to establish probable cause to believe Clayton was involved in the distribution of large quantities of controlled substances. The inference that the pallet was delivered to the Tower Avenue residence established a strong connection between that property and Clayton's suspected criminality. Moreover, the affidavit notes the presence of external video surveillance, the fact that only Clayton and his vehicles had previously been seen at the property, and the fact that the blinds in the house remain closed, all of which support the inference that evidence of the distribution of controlled substances likely would be found inside. Finally, it is well-established and oft repeated that evidence of drug dealing is likely to be found in a drug dealer's home.

(R. 97 at 46.)

> For many of the same reasons that evidence of drug dealing is likely to be found in a drug dealer's home, there is some reason to suspect that evidence of drug dealing is likely to be found in a drug dealer's car. But, more importantly, the fact that Clayton drove the Kia from the delivery of the pallet at the parking lot to his home makes it probable that evidence related to the distribution of controlled substances might be found in the Kia.

(R. 97 at 47.)

Finally, as to the Granville home, the magistrate judge noted that probable cause does not require direct evidence linking a crime to a particular place. (R. 97 at 47, citing United States v. Zamudio, 909 F.3d 172, 175 (7th Cir. 2018).)

24

Clayton's argument also views the issue too narrowly in that it suggests that evidence is limited to what is immediately and objectively recognizable as suggestive of criminal activity. In a high-level drug investigation, for example, a wide variety of financial records might tend to support the investigation. These otherwise ordinary records that all persons acquire in their daily life may accumulate at any place a person spends significant time, including a home, car, or at his mother's home, especially given that his mother stated Clayton sometimes slept there and was known to store property there. The likelihood of finding evidence at the Granville home is enhanced by the fact that Clayton had spent the night of March 15-16 there, and it was shortly after he left that home on the morning of March 16 that he met the delivery of the pallet.

(R. 97 at 48.)

Clayton objects to this finding as well. (R. 103 at 1.) He notes that no less than three separate constitutional violations contributed to the warrant—the illegal search of his vehicle in January 2021, the illegal entry into his home on March 16, 2021, and the illegal search of Coleman's truck on March 16, 2021—corrupting the warrant beyond redemption. (R. 103 at 9.) He contends that merely removing that evidence from the warrant, rather than quashing the warrant in its entirety, fails to achieve the deterrent purpose of the exclusionary rule. (R. 103 at 10.)

Clayton cites district court decisions from another circuit in support of this argument. (R. 103 at 10.) However, the Seventh Circuit has held that, in these circumstances, the court should proceed as the magistrate judge did here: determining whether the untainted information in the warrant application establishes probable cause. Markling, 7 F.3d at 1317; see also United States v. Shelton, 997 F.3d 749, 770 (7th Cir. 2021) ("[A] search warrant that has been obtained, in part, with evidence which is tainted can still support a search if the untainted information, considered by itself, establishes probable cause for the warrant to

25

issue.").[7]

The reviewing court will uphold a finding of probable cause so long as the issuing judge had a substantial basis to conclude that the search was reasonably likely to uncover evidence of wrongdoing. United States v. Schenck, 3 F.4th 943, 946 (7th Cir. 2021). As in the arrest context, probable cause to search is not a high standard; it simply means there is a reasonable likelihood evidence of wrongdoing will be found. Id. "Probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity. Probable cause is a flexible, common-sense, totality-of-the-circumstances standard." Id. (internal citation and quote marks omitted).

Clayton argues that the affidavit lacked a sufficient nexus linking any criminal activity to the Granville home. (R. 103 at 11.) However, he does not further develop the argument or meaningfully engage with the magistrate judge's analysis, e.g., the evidence that Clayton spent the night of March 15-16 at the Granville home and that he met the delivery of the pallet shortly

_____

[7]Clayton argues that the evidence obtained from these violations was no doubt relied upon by the issuing magistrate judge. (R. 103 at 9.) However, the Seventh Circuit has clarified that the fact that an application for a warrant contains information obtained through an unlawful entry does not perforce indicate that the improper information "affected" the magistrate's decision to issue the warrant. Rather, if the application contains probable cause apart from the improper information, then the warrant is lawful and the independent source doctrine applies, provided that the officers were not prompted to obtain the warrant by what they observed during the initial entry. Markling, 7 F.3d at 1317 (citing United States v. Restrepo, 966 F.2d 964, 970 (5th Cir. 1992)). Clayton makes no argument that the agents were prompted to obtain the warrant by what they observed during the protective sweep of his home (or during the other challenged actions). Cooper's hearing testimony suggests he had decided to apply for a warrant before Clayton and Coleman were arrested that day. (R. 93 at 167:1-4.) The testimony from Agent Williams similarly suggests that the agents had decided to obtain a warrant before the sweep was done. (R. 93 at 204:18-23.) Like the magistrate judge, I make no finding regarding whether the agents lawfully entered the house to check "for any confederates who may have concealed themselves inside the residence in order to destroy evidence or arm themselves." (R. 43-1 at 13 ¶ 27.)

26

after he left that home on the morning of March 16.[8]  (R. 97 at 48.)

Clayton further argues that the evidence seized from the Tower Avenue home should also be suppressed, as there is no link tying him to a criminal act other than his mere association with parties of interest.  (R. 103 at 11-12.)  As discussed above, the agents gathered significant circumstantial evidence of Clayton's involvement in money laundering and drug trafficking between August 2020 and March 2021.  Clayton argues that the arrival of the March 16, 2021 pallet appears to have triggered the agents' belief in probable cause, but the pallet had no connection to the Texas pallet, agents had no idea what was in it and where it came from, and they had no idea where it went after it left the parking lot in Coleman's truck. (R. 103 at 12.)

As indicated in the warrant application, based on the observations made on camera and the investigation to date, agents believed the pallet contained narcotics.  (R. 43-1 at 12 ¶ 25.) And contrary to Clayton's argument that the agents had no idea where the pallet went after it left the parking lot, agents were able to track Clayton to the Tower Ave. residence, where they observed Coleman's truck backed into the driveway, with the tailgate lowered and the bed empty.  It was reasonable to infer that the pallet had been unloaded at that location.

For these reasons and those stated in the magistrate judge's recommendation,

---

[8]Clayton develops no separate argument regarding the search of the Kia.  See United States v. Barr, 960 F.3d 906, 916 (7th Cir. 2020) (stating that undeveloped arguments are waived).  The magistrate judge stressed that Clayton drove the Kia from the delivery of the pallet at the parking lot to the Tower Ave. residence.  (R. 97 at 47.)  But as noted earlier in the recommendation, in the warrant affidavit Cooper averred that on numerous occasions agents observed the Kia at locations involved in the investigation; agents believed Clayton drove the Kia to these locations in furtherance of his drug trafficking and money laundering activities.  (R. 97 at 44, citing R. 43-1 ¶ 29.)  Thus, the link between the vehicle and the suspected crimes was not based on the March 16, 2021 incident alone (which would appear to distinguish Clayton's situation from Coleman's).

27

Clayton's motion to suppress the evidence obtained pursuant to the search warrants (R. 43) will be denied.

**B.    Coleman's Motions**

Coleman filed three motions to suppress regarding the events of March 16, 2021, challenging the traffic stop (R. 29), his arrest (R. 30), and the search of his truck (R. 31). He argued that the police unlawfully stopped him without reasonable suspicion of any traffic violation or probable cause of any offense. (R. 29 at 1-2.) He further argued that after the stop officers immediately arrested him without explanation and without probable cause. (R. 30 at 1-2.) Finally, he argued that the officers then searched his truck, with no independent basis. (R. 31 at 2-3.)

The magistrate judge held an evidentiary hearing on the motions, at which it was established that two Milwaukee police officers stopped and arrested Coleman at the direction of a HIDTA supervisor. After identifying the driver of the vehicle as the person they were looking for, the officers ordered Coleman out and handcuffed him. No other basis for the stop and arrest was identified. (R. 97 at 29.) Cooper arrived at the scene of the stop and asked the officers to take Coleman to the police station. Shortly after Coleman left the scene, DEA Agent Scott Marlow arrived. Marlow conducted an inventory search of the truck because it was going to be towed to DEA headquarters, locating 10 kilograms of cocaine, cell phones, and documents. (R. 97 at 30.)

The magistrate judge noted that in this instance, unlike the stop of Clayton in January 2021, the officers acted at the direction of the DEA. Thus, the collective knowledge doctrine

28

applied. (R. 97 at 30-31.)[9] At that point, the agents knew Coleman as an associate of Clayton's and in frequent contact with him. They had also been co-defendants in a previous federal drug case, for which Coleman was still on supervision. Agents also knew that Clayton previously stopped by Coleman's home before meeting with his money launderer, consistent with a dealer collecting money owed to him. And Coleman was involved in the loading of the pallet on March 16, which he then drove to Clayton's home. (R. 97 at 31.) The magistrate judge further noted the tip that Clayton's trucking business was a front for money laundering, and Clayton's previous transport of a pallet shipped from Texas. (R. 97 at 32.) It was reasonable, the magistrate judge concluded, for the agents to suspect that the March 16 pallet contained drugs given the apparent effort to conceal its ultimate destination (delivered to a commercial parking lot, moved to a different vehicle, then driven to Clayton's home). (R. 97 at 32-33.)

> Taken together, all of these details add up to probable cause to believe that the half-pallet contained controlled substances. The fact that it was only a half-pallet and wrapped in green plastic, whereas the prior pallets were full pallets and wrapped in clear plastic, is insufficient to undermine the existence of probable cause. In some respects, it should hardly be surprising that the organization made some changes after law enforcement intercepted 61 kilograms of cocaine. Ultimately, it is the similarity in the methods that tends to support probable cause.

> This does not end the analysis, however. There must also be probable cause that Coleman knew that the pallet contained controlled substances. After all, he could have been innocently helping out a friend without knowing what was in the pallet. But again, probable cause does not require the negation of innocent explanations. And there are sufficient facts to support an inference that Coleman

---

[9]See United States v. Gary, 790 F.3d 704, 706 (7th Cir. 2015) ("The officers who pulled over the car had no personal knowledge of that investigation. They stopped the vehicle at the direction of a narcotics detective. But knowledge of the investigation can be imputed to the arresting officers through the collective knowledge doctrine, under which the court will consider the information known to the officers collectively to determine if there was probable cause for the arrest.").

was complicit. As noted, the manner of the delivery—first to Clayton's commercial parking lot and then to Clayton's home—was not consistent with a commercially reasonable practice. And given that Clayton had a similar truck, if Coleman was not complicit, the fact that Clayton did not simply transport the pallet himself (as he had done with a prior pallet) is suspicious.

There is then the fact that Clayton stopped by Coleman's home on his way to meet with a money launderer, which Cooper described as consistent with picking up cash from customers, supporting the inference that Coleman was involved in the activity that generated funds that Clayton needed to launder. And the fact that they had been previously convicted together for conspiring to distribute more than five kilograms of cocaine also supports a finding of probable cause. Based on this conviction, they were almost certainly prohibited from being in contact with each other, and the fact that they were communicating at all bolstered the existence of probable cause.

All of these facts taken together add up to probable cause to believe that Coleman had conspired to possess controlled substances. Consequently, there was probable cause to stop his truck on March 16, 2021 and arrest him.

(R. 97 at 33-34, record citations omitted.)

The magistrate judge reached a different conclusion regarding the search of the truck, however. Coleman had been transported away from the scene prior to the search, meaning the search could not be sustained as one incident to arrest, and the government did not argue that the agents had probable cause to search the truck under the automobile exception. Rather, the government sought to justify the search as an inventory search. (R. 97 at 35.)

The magistrate judge noted that an inventory search requires a lawful seizure of the vehicle. (R. 97 at 36, citing Cartwright, 630 F.3d at 614.) Although there was evidence that Coleman's truck was used in the transportation of controlled substances, the government did not argue it could be seized on that basis.

In fact, the government does not articulate a basis for seizing Coleman's truck. It appears to have been legally parked on a residential street, and notwithstanding his arrest Coleman presumably could have made arrangements for its timely removal. The government presented no evidence that DEA policy required agents to seize the vehicle in the interest of safeguarding it. And taking

30

possession of a vehicle subjects an agency to potential liability it would not otherwise have been subject to.

(R. 97 at 36-37, citations omitted.)

Nor, the magistrate judge noted, had the government established that the search was conducted in accordance with any established policy. Marlow testified that while he assumed the DEA had a written policy on inventory searches, he had no specific recollection of the policy, had not reviewed it prior to this search, and had not reviewed it since. (R. 97 at 37-38.) The magistrate judge concluded:

> The court shares Marlow's presumption that the DEA almost certainly has a policy on inventory searches, but without proof of it the court cannot say that the search was conducted in accordance with any established policy or practice. Although the policy need not be written, the government has failed to elicit evidence of an unwritten policy or standard practices in the DEA regarding inventory searches.
>
> Because there is no evidence that the search of the vehicle was conducted in accordance with any established policy or procedure, the court cannot conclude that the government has sustained its burden to prove that the inventory search exception to the warrant requirement applies.

(R. 97 at 38-39, case and record citations omitted.)

Both sides object. The government challenges the magistrate judge's suppression recommendation, arguing that both the automobile and inventory search exceptions apply; the government presents additional evidence regarding the DEA inventory search procedure and a copy of the receipt of the items taken in this instance. (R. 102 at 1, 17; R. 102-1 & 102-2.) Coleman objects to consideration of the government's new evidence (R. 104) and further argues that the magistrate judge erred in evaluating the lawfulness of the stop and arrest (R. 101 at 1-2). I first address probable cause to search, then the inventory search, and, finally, probable cause for the stop and arrest. As Coleman notes, because the agents declined to

31

obtain warrants in this case, the government bears the burden of justifying the challenged police actions under any of these theories.  (R. 101 at 26.)

### 1.    Probable Cause to Search/Automobile Exception

The government indicates that in its briefing before the magistrate judge it sought to justify the search based on the automobile exception and as an inventory search.  (R. 102 at 2.)  However, the magistrate judge neglected to analyze the automobile exception argument.  The government asks this court to review the issue de novo.  (R. 102 at 17.)

Under Arizona v. Gant, the police may conduct a vehicle search (1) "when an arrestee is within reaching distance of the vehicle" or (2) "it is reasonable to believe the vehicle contains evidence of the offense of arrest."  556 U.S. 332, 346 (2009).  The government concedes that the first justification does not apply here, as Coleman had been removed from the vehicle and handcuffed at the time of the search.  However, the government argues that the second justification applies.  The government further notes that, if there is probable cause to believe a vehicle contains evidence of criminal activity, the police may under United States v. Ross, 456 U.S. 798, 820-821 (1982), search of any area of the vehicle in which the evidence might be found.  (R. 102 at 18.)[10]

The government argues that the facts known by the officers at the time of the search supported probable cause for a search of the vehicle.  (R. 102 at 18.)  Coleman and Clayton had previously been federally prosecuted together for drug trafficking, Clayton had been under investigation for close to a year prior to the March 2021 stop, in August 2020 the FBI received

---

[10]As discussed below, there is some uncertainty in the case-law regarding how the second prong of the Gant test relates to the automobile exception recognized in previous decisions like Ross.

32

a tip that Clayton and his business were involved in money laundering, in October 2020 law enforcement in Texas seized the pallet containing 61 kilograms of cocaine destined for Milwaukee, video surveillance showed Clayton taking custody of a similar pallet, and tracking of Clayton's phone in early 2021 suggested collection of drug proceeds and meeting with a suspected launderer. (R. 102 at 19.) Finally, on March 16, 2021, agents observed the delivery of the pallet, which was then transported to Clayton's suspected stash house on Tower Ave. (R. 102 at 19-20.)

The government contends that the magistrate judge correctly determined that the agents had probable cause to stop and arrest Coleman as he drove away from the Tower Ave. residence. (R. 102 at 20.) The government argues that, given these facts, it was reasonable for the police to believe that Coleman's vehicle contained evidence of a crime.[11] (R. 102 at 20-21.) The agents suspected Clayton and Coleman were conspiring to traffic drugs; based on the type of case and the central role motor vehicles played in the investigation, it was reasonable for the agents to believe that Coleman's vehicle would contain evidence of the conspiracy, such as money, cell phones, and possibly controlled substances. (R. 102 at 22.) The government concludes:

---

[11]The government notes that some courts have concluded that Gant's "reasonable to believe" language suggests a less demanding standard than probable cause. (R. 102 at 21, citing United States v. Rodgers, 656 F.3d 1023, 1028 n.5 (9th Cir. 2011) (noting that the Gant standard "appears to require a level of suspicion less than probable cause"); United States v. Vinton, 594 F.3d 14, 25 (D.C. Cir. 2010) ("Rather, the 'reasonable to believe' standard probably is akin to the 'reasonable suspicion' standard required to justify a Terry search."). In United States v. Edwards, 769 F.3d 509, 514 (7th Cir. 2014), the Seventh Circuit declined "to decide whether the two standards are different." The Seventh Circuit has explained that the suspicion required for a vehicle search incident to arrest is keyed to the offense of arrest, while the automobile exception is not tied to an arrest and requires probable cause that the vehicle contains evidence of criminal activity. United States v. Paige, 870 F.3d 693, 702 (7th Cir. 2017).

33

Case agents had probable cause to arrest Jeffrey Coleman on March 16, 2021. They knew Coleman and Clayton had a history of trafficking in narcotics. They knew Coleman was under investigation for drug trafficking by local authorities. They knew Clayton had laundered close to one million dollars in currency including $149,000 to an undercover agent. They knew Clayton prior to meeting with a suspected money launderer reversed his direction to return to the residence of Jeffrey Coleman to obtain additional monies for laundering. Agents knew Clayton had taken delivery of a pallet in August of 2020 that looked similar to a pallet seized in Texas in October 2020 that contained 61 kilograms of cocaine. Finally, they knew on March 16, 2021, that Coleman had taken possession of a third shipping pallet and that shortly thereafter Coleman and Clayton traveled to the suspected stash house of Clayton's drug operation and the pallet was no longer in Coleman's vehicle. The facts and all reasonable inferences would lead agents to believe that probable cause existed to arrest both Coleman and Clayton upon leaving the Tower Avenue location and search their vehicles.

(R. 102 at 24.)

Coleman acknowledges that, although the criminal complaint referenced an inventory search and at the hearing the witnesses stuck with that theory, the government in its briefs before the magistrate judge did argue that the search was valid under the automobile exception. (R. 101 at 27.) The magistrate judge overlooked that argument. However, Coleman argues that the government never explained probable cause for what; even assuming the agents had probable cause to arrest him, the government failed to establish that the truck still would have held evidence or contraband. (R. 101 at 27.)[12]

Coleman contends that the only item the agents might have relied on for probable cause—the pallet—was gone from his truck by the time of the search, and there was no reason

---

[12]Coleman filed his objections before the government. In his response to the government's objection, he more fully addresses the government's argument on this issue. In tracking Coleman's argument I primarily rely on the latter document but have considered the arguments in both. (R. 101 at 25-28.)

34

to believe other unknown evidence of criminality might remain.  (R. 104 at 2-3; R. 101 at 28.)[13] The criminal complaint used to commence this case explicitly relied on a suspected traffic violation to justify the stop and an inventory search to justify the search.  (R. 104 at 4-5.) Coleman argues that the government's new theory—that the agents believed his vehicle contained evidence of a drug conspiracy—lacks record support.  (R. 104 at 6.)  He notes that this was primarily a money laundering investigation, the agents provided no testimony that they believed Coleman's truck contained evidence of a drug conspiracy, and the record contains no evidence supporting the notion that motor vehicles played a central role in the investigation. (R. 104 at 7.)

Coleman acknowledges that the government invoked Gant in its briefing before the magistrate judge.  However, it is unclear whether the government is arguing the search was incident to arrest or under the automobile exception.  (R. 104 at 8.)  A search incident to arrest authorizes a search of only the passenger compartment of a vehicle (R. 104 at 8, citing United States v. Slone, 636 F.3d 845, 852 (7th Cir. 2011)), while the automobile exception allows a search of any place in the car that the object of probable cause might be found (R. 104 at 9, citing Cal. v. Acevedo, 500 U.S. 565, 580 (1991)).

Coleman acknowledges the confusion caused by the second half of the Gant formulation, which could be seen as recalling the automobile exception or as identifying a stand-alone justification for a search.  (R. 104 at 9.)  Regardless, Coleman argues that the search cannot be sustained under either understanding: the toolbox was in the bed of the truck,

---

[13]Coleman also argues against a search incident to arrest.  (R. 104 at 4, 19.)  As indicated above, the government concedes the first prong of the Gant standard is unavailable here since Coleman had been removed from the truck and arrested.  I address the second prong of the Gant standard below.

not the passenger compartment, making the search incident to arrest theory inapplicable, and since the pallet was gone by the time of the search, there was no probable cause to believe anything illegal would be found in the truck, making the automobile exception inapplicable. (R. 104 at 10-11.)

Even if the agents had probable cause to arrest him, Coleman argues they lacked probable cause that the vehicle contained evidence of crime at the time of the search. (R. 104 at 12-14.) Coleman separately objects to the magistrate judge's conclusion that the officers had probable cause to arrest him on March 16 based on the transport of the pallet, but he contends that even if he loses that argument there would be no probable cause as to his vehicle, as the pallet was no longer in it. (R. 104 at 15.) Nothing else connected his truck to the Clayton investigation. (R. 104 at 16.) And until the objections, the government never suggested what the agents might have expected to find in the truck. (R. 104 at 17.) At the hearing, the agents provided no testimony, based on their experience and investigation, as to what they expected to find in Coleman's truck. (R. 104 at 17-18.) Rather, they justified the search under the inventory theory. Thus, Coleman contends, the argument that the agents expected to find evidence of the investigated drug conspiracy is underdeveloped and factually unsupported. (R. 104 at 18.)

Finally, Coleman argues that the search cannot be justified as one incident to arrest under Gant and Slone. First, as indicated, the cocaine at issue was not found in the passenger compartment but rather in a toolbox in the bed of the truck. (R. 104 at 19-20.) Second, Coleman argues that there was no reason to believe evidence any drug conspiracy would have been found in the passenger compartment. The half pallet agents saw loaded into the truck had been unloaded, the agents saw nothing else given to Coleman, and there was no evidence

36

of any phone contact between Coleman and other suspects that day. The agents located Coleman's truck at the Tower Ave. residence (Clayton's suspected stash house), and they saw nothing loaded back into the truck. Nor did they see Coleman do anything, other than get into the truck and leave. (R. 104 at 21.)

On de novo review of the record and the submissions, I find that the government has failed to justify the March 2021 search of Coleman's vehicle under the automobile exception. While I agree with the magistrate judge that the agents had grounds to seize Coleman at that time (as discussed below), the automobile exception does not apply simply because the police have probable cause to arrest the driver. They must have probable cause that the vehicle contains evidence of criminal activity. See Edwards, 769 F.3d at 514.

In its objection briefing, the government suggests that the agents had reason to believe Coleman's vehicle would contain evidence of a drug trafficking conspiracy, e.g., money, cell phones, or controlled substances. However, the agents did not in their reports, the criminal complaint, or the hearing testimony set forth specific facts supporting such a belief. To the contrary, they consistently described this as an inventory search.

I acknowledge that the probable cause inquiry is an objective one; the subjective motivations of the officer will not invalidate a search otherwise supported by probable cause. "Importantly, however, probable cause depends not on the facts as an omniscient observer would perceive them but on the facts as they would have appeared to a reasonable person in the position of the arresting officer--seeing what he saw, hearing what he heard." Carmichael v. Vill. of Palatine, 605 F.3d 451, 457 (7th Cir. 2010) (internal quote marks omitted); see also id. ("The reasonableness of the seizure turns on what the officer knew, not whether he knew the truth or whether he should have known more."); Richardson v. Bonds, 860 F.2d 1427, 1431

37

(7th Cir. 1988) (["W]hile an objective standard is to be employed in assessing the legal basis for an arrest, we will not indulge in ex post facto extrapolations of all crimes that might have been charged on a given set of facts at the moment of the arrest, nor will we look favorably upon arguments of the government doing the same.") (internal quote marks and alterations omitted).

The agents were prompted to seize Coleman on March 16 based on the delivery of the pallet. But the agents knew the pallet had been removed from Coleman's truck at the time of the search, and the record contains no specific evidence suggesting other contraband or evidence would be found in Coleman's truck. Whether the issue is analyzed under the second prong of the Gant test or under the traditional automobile exception, the warrantless search cannot be sustained.[14]

### 2. Inventory Search

The government notes that the magistrate judge found significant that the DEA policy on inventory searches was not admitted into evidence. The magistrate judge did admit the DEA-6 investigative report and DEA-7 property inventories. The government notes that, in conducting de novo review, the district court may receive additional evidence, and with its objections here the government submits the one-paragraph DEA inventory policy and Form DEA-12 ("Receipt for Cash or Other Items"). (R. 102 at 25; R. 102-1; R. 102-2.)

The government notes that at the hearing Detective Cooper testified that he decided to take custody of Coleman's vehicle based on its involvement in drug trafficking. (R. 102 at 25-26.) Once a vehicle has been impounded, police are allowed to conduct an inventory search

---

[14]The government has not disputed Coleman's assertion that a search incident to arrest must be limited to the passenger compartment.

as part as part of the routine procedure incident to incarcerating an arrested person and in accordance with established inventory procedures. (R. 102 at 26.) At the hearing, Agent Marlow testified that he and his partner conducted an inventory search at the scene prior to the vehicle being towed to the DEA field office. The government contends that the search complied with the policy it now presents. The policy provides that all items shall be inventoried on a DEA-12 form and the details of the inventory shall be reported in the DEA-6 that reports the related enforcement activity. (R. 102-1.) In this case, the eight-page DEA-6 report documenting the inventory was admitted at the hearing, along with a DEA-7 documenting the acquisition of the inventoried property as evidence. The government attaches to its objections the DEA-12 inventorying the items seized from Coleman's vehicle. (R. 102 at 27; R. 102-2.)

The government further contends that the evidence submitted at the hearing was sufficient to show that the search was conducted in accordance with an established policy or procedure. (R. 102 aat 27-28.) Agent Marlow testified: "As part of our policy it was being towed to the DEA building in West Milwaukee. And I conducted -- myself and my partner -- conducted an inventory search of the vehicle prior to it being towed." (R. 93 at 210:13-16.) "I was told [by Task Force Officer Cooper] to take custody of the vehicle, do an inventory search prior to being towed, for further evidence." (R. 93 at 215: 4-5.) The items recovered were documented on the DEA-7 and logged into evidence. (R. 93 at 212, 214.) The government concludes that if the court accepts the two pages of additional evidence attached to the objection it is clear the agents complied with the DEA written policy. (R. 102 at 28-29.) If the court does not accept the reports, the government asks the court to permit additional testimony from Agent Kazamias, the author of the reports documenting the search, as permitted by the rules. Fed. R. Crim. P. 59(b)(3) ("The district judge may accept, reject, or modify the

39

recommendation, receive further evidence, or resubmit the matter to the magistrate judge with instructions.").

Finally, the government contends that Agent Marlow's testimony that he had no specific recollection of the policy and did not have it with him at the time does not void the search. (R. 102 at 29; R. 93 at 221.) The government notes that courts have upheld inventory searches despite technical failures to follow the written policy or other administrative errors. (R. 102 at 30, collecting cases.) Here, aside from Marlow's inability to recall the specifics of the policy, the evidence shows that the agents followed it. (R. 102 at 30-31.)

Coleman responds that the court should strike the two new exhibits, which could have been presented at the evidentiary hearing before the magistrate judge. (R. 104 at 1-2.) Even if the court does accept them, Coleman argues that they actually undercut the government's argument. (R. 104 at 2.) First, the policy applies to property taken in by the DEA for safekeeping; the record here shows that the items were seized as evidence. (R. 104 at 23.) Second, the policy provides that an inventory search is to be conducted as soon as practical after the property has been transported to a DEA or other law enforcement facility; this search was done on a public street, where the truck was lawfully parked, before it was taken to the HIDTA lot. (R. 104 at 23-24.) Third, the policy provides that search shall be made of all containers, locked or unlocked, that are seized for safekeeping; here, the evidence shows that a number of containers in the vehicle were not inventoried. (R. 104 at 24.) Coleman concludes that this was an evidentiary search, not an inventory search, and it certainly did not comply with the policy the government now proffers. (R. 104 at 24.)

I agree with the magistrate judge that this search cannot be justified as an inventory search, even if I were to consider the policy and inventory record now proffered. While officers

40

need not follow an inventory policy to the letter, see Cartwright, 630 F.3d at 616, the evidence shows that this was not really an inventory search but rather a means of discovering incriminating evidence, see Wells, 495 U.S. at 4.  Agent Marlow testified that he was instructed to conduct a search "for further evidence."  (R. 93 at 215:5; see also R. 93 at 216: 12, indicating the items were: "Processed through evidence.".)  He further testified that the exhibits numbers assigned the items taken from Coleman's truck were not in order because they were intermingled with evidence collected from other locations involved in the investigation, e.g., Granville Circle.  (R. 93 at 217-18.)  Finally, the DEA-12 now proffered indicates the items were "seized as evidence."  (R. 102-2.)

Nor has the government established that it was necessary to impound/tow Coleman's vehicle.  See Cartwright, 630 F.3d at 614 (noting that the decision to impound is analyzed as distinct from the decision to inventory).  Nothing in the policy now proffered appears to require towing under these circumstances.  At the hearing, Officer Viera and Det. Cooper testified that the vehicle was lawfully parked (R. 93 at 59-60, 147), but Cooper "it was being removed because of it's involvement in drug-trafficking activity" (R. 93 at 147:21-23).  The government quotes this testimony (R. 102 at 26) and suggests that "because the vehicle was used in the possible transportation of controlled substances it was subject to forfeiture and seizure as it was in effect a crime scene.  (R. 102 at 27.)   However, the government does not otherwise develop an argument as to how the vehicle was lawfully seized as subject to forfeiture.  See Pennie v. City of Rockford, No. 3:19-cv-50120, 2022 U.S. Dist. LEXIS 19632, at *15 (N.D. Ill. Feb. 3, 2022) ("In other words, the Defendants have not pointed to any evidence that Officer Campbell impounded Pennie's vehicle on the basis that it was subject to forfeiture because the vehicle itself was considered evidence in need of preservation.  Instead, the Defendants merely

41

argue that state law permits impoundment, and so it must be reasonable under the Fourth Amendment."). Cf. United States v. Pace, 898 F.2d 1218, 1244 (7th Cir. 1990) ("The police seized Besase's car pursuant to a forfeiture statute, and were holding the car pending forfeiture proceedings.").

For these reasons and those stated by the magistrate judge, Coleman's motion to suppress/unlawful auto search (R. 31) will be granted.

### 3. Probable Cause for Arrest

Coleman argues that the evidence at issue should also be suppressed because the agents lacked probable cause to stop and arrest him in the first place. (R. 101 at 1-2.) First, in the criminal complaint commencing this case, Det. Cooper swore that the police stopped Coleman because of a traffic violation (a missing rear license plate), but that rationale fell apart when it was learned that an "apportioned" vehicle like Coleman's needs no rear plate under Wisconsin law. (R. 101 at 2-3.) Second, none of the officers involved at the scene behaved as if they had probable cause. (R. 101 at 3.)

Coleman discusses the background facts of the case, noting that the investigation initially focused on Clayton. Coleman's name came up in the fall of 2020 when the agents, investigating the tip that Clayton and a co-defendant in Clayton's previous case were engaged in money laundering, learned that Coleman had also been a co-defendant in that earlier case. (R. 101 at 4.) In December 2020, agents learned that Coleman was under investigation by Milwaukee police for unknown reasons. Monitoring of Clayton's phone and vehicle at that time revealed contacts with Coleman, but Coleman argues that the magistrate judge overstated the pertinent facts: the magistrate judge referenced "frequent contact" (R. 97 at 31), while Cooper testified that he could not recall the number of calls, stating only "more that two" (R. 93 at 121).

42

Coleman also takes issue with the magistrate judge's conclusion that the two men were prohibited from having contact, noting that no witness said that, nor did the agents testify any no-contact order was significant. (R. 101 at 5.) Coleman further contends that the vehicle tracking showed only that Clayton went to the area of Coleman's residence once on January 27, 2021, contrary to the magistrate judge's finding that Clayton stopped at Coleman's home. (R. 101 at 5, citing R. 97 at 31.)

Coleman discusses the agents' monitoring of pallets from Texas, noting that the agents lacked information of such pallets being shipped from Texas to Milwaukee after October 2020. He further notes that the pole camera installed in November 2020 did not capture him prior to March 16, 2021. (R. 101 at 7.) During monitoring of the camera on that date, Cooper recognized Clayton, but he did not, at the time, know the other man to be Coleman. (R. 101 at 8.) The pallet agents saw March 16 was unlike the previous pallets out of Texas, and it arrived in a van with Iowa plates. Agents did not follow Coleman's truck from the lot but later observed it at the Tower Ave. residence, about 10 minutes away. (R. 101 at 9.) While the agents noted the tailgate was down, they did not see anything unloaded from or into the truck from the residence. (R. 101 at 10-11.) Coleman concedes that the agents had likely identified him by the time he pulled away. As directed, two Milwaukee police officers stopped Coleman and immediately arrested him. Coleman faults the magistrate judge for overlooking the government's abandonment of the claim, made in the criminal complaint, that the stop was based on a suspected traffic violation. (R. 101 at 11.) Coleman further notes that the complaint identified the search as an inventory search (R. 101 at 12), but his truck was parked legally and near the curb (R. 101 at 13). At Cooper's direction, the Milwaukee officers took Coleman to a nearby police station, then to the DEA office. (R. 101 at 13-14.) Coleman

43

contends that, given the timing of the search of his truck, the directive to move Coleman from the station to the DEA office was motivated by the discovery of cocaine in the truck. (R. 101 at 15-16.) Coleman argues that this timing suggests the agents did not believe they had probable cause to arrest Coleman until after the discovery; they had a hunch Coleman was involved because he had wandered into their investigation of Clayton, but nothing more. (R. 101 at 16.)

Coleman notes that probable cause must be particularized to the person, not based on proximity to a suspected criminal. Further, while the analysis is objective, it must be based on facts known to the officers at the time of the arrest. (R. 101 at 17.) Coleman concedes that the agents and officers involved here had collective knowledge of the Clayton investigation, but contends that they lacked a particular basis for his arrest. (R. 101 at 18.) In analyzing Clayton's motions, the magistrate judge declined to rely solely on the movement of the March 16 pallet, further considering the previous investigation into Clayton. (R. 101 at 18.) Coleman argues that the magistrate judge exaggerated his connection to Clayton in finding the movement of the pallet suspicious. (R. 101 at 19.) Coleman argues that it is not suspicious that he and Clayton have similar trucks, or that Clayton had the pallet delivered to a commercial location before it was transported to his home. (R. 101 at 20.) The delivery was made in broad daylight in a visible area, the agents had no direct evidence that the pallet went to Clayton's house (as no one followed Coleman's truck from the lot to Tower Ave.), and the previous connection between the two men was exaggerated (for the reasons noted earlier). (R. 101 at 20-22.) Coleman compares his case to United States v. Davis, 430 F.3d 345 (6th Cir. 2005), in which a divided panel found that officers lacked probable cause to stop and search the vehicle of a man seen meeting with the target of a drug investigation. (R. 101 at 23-25.) Like

44

the defendant in <u>Davis</u>, Coleman contends that he merely wandered into a larger investigation. (R. 101 at 25.)

Davis is distinguishable. In that case, the officers had no previous encounters with Davis and did not know who he was when he was seen meeting with the target. 430 F.3d at 349. After Davis drove away, investigating officers notified state troopers that they believed Davis was carrying contraband, and a trooper stopped Davis (ostensibly for speeding). <u>Id.</u> at 349-50. After issuing a warning for speeding, the trooper called for a drug sniffing dog, which failed to alert to the presence of drugs. <u>Id.</u> at 350. Unsatisfied, a DEA agent who arrived on the scene called for a second dog, which did alert. Based on the alert, agents got a warrant for the vehicle, seizing $705,880 in cash during the subsequent search. <u>Id.</u>

The panel majority concluded that the trooper had probable cause to stop Davis for speeding, but rejected the conclusion of the dissenting judge that the trooper validly stopped Davis based on probable cause that his vehicle contained contraband. <u>Id.</u> at 352. The majority noted that sanctioning the police action on those grounds would expose anyone seen conversing with a drug suspect to stop and search. <u>Id.</u> at 353.[15]

Here, Coleman was not a stranger to the case on March 16, 2021. The agents knew he was a co-defendant of Clayton's in the prior drug and money laundering prosecution (R. 93

_____

[15]Interestingly, the majority went on to hold that the police had reasonable suspicion to detain Davis for 30-45 minutes for the <u>first</u> dog sniff, <u>id.</u> at 354, noting that "the investigators had sufficient reason to suspect that Davis was transporting narcotics in his vehicle to justify an additional delay of Davis's vehicle to allow further police investigation," <u>id.</u> at 355. However, once the first dog failed to alert, the officers' suspicions that Davis possessed drugs were dispelled. <u>Id.</u> at 356. Thus, detaining him for the <u>second</u> dog sniff was unreasonable. <u>Id.</u> at 356-57. As discussed in the text, the background evidence against Coleman in this case is stronger; he was no stranger to the case when the officers observed him on March 16, 2021. Thus, <u>Davis</u> suggests that the police at least had reasonable suspicion to stop and detain Coleman on March 16, 2021.

45

at 86), they knew the two were previously in phone contact (R. 93 at 94), and they knew Clayton stopped by Coleman's residence before meeting with his money launderer (R. 93 at 99).

Coleman quibbles with the magistrate judge's finding of "frequent" phone contacts, noting that on cross-examination Cooper said he did not recall how often they called each other. (R. 93 at 121.) However, earlier in his testimony Cooper stated that agents obtained Clayton's phone records and "attempted to identify numbers that were in frequent contact with him." (R. 93 at 94:8-10.) As part of that process, they came across Coleman's number.[16] (R. 93 at 94:14.) Cooper further testified that they were "looking for numbers that are in frequent contact" (R. 93 at 95:22), and "one of those numbers . . . was identified as a number associated with Jeffrey Coleman." (R. 93 at 95:25-96:1.) Coleman also contends that the agents knew only that Clayton stopped in the area of his (Coleman's) home, but Cooper testified that Clayton "arrived at 3806 North 27th Street in Milwaukee" (R. 93 at 99:14-15), and that "3806 North 27th Street is the residence of Jeffrey Coleman" (R. 93 at 99:19-20).[17]

Thus, the agents had some reason to believe Coleman was involved in Clayton's activities prior to the delivery and transport of the pallet on March 16, 2021. While the evidence of Coleman's involvement in drug trafficking at that time was not overwhelming, the showing required to establish probable cause is considerably less than that required to sustain a

_____

[16]Around the same time, the agents learned that the Milwaukee Police Department was also investigating Coleman. (R. 93 at 94:21.) Coleman notes that we do not know what that investigation was about, but at the hearing he objected when the government asked: "And what kind of investigation did they have regarding Mr. Coleman?" (R. 93 at 94:25-25.)

[17]While Cooper did not specifically reference a no-contact order, he did testify that he was aware Coleman was on federal supervised release for a drug trafficking case in which Clayton was a co-defendant. (R. 93 at 170:19-22.)

46

criminal conviction; it is not proof beyond a reasonable doubt, or even proof by a preponderance of the evidence. <u>Purvis v. Oest</u>, 614 F.3d 713, 723 (7th Cir. 2010). For these reasons, I will adopt the magistrate judge's recommendation on Coleman's motion challenging the arrest (R. 30).

IV.

**THEREFORE, IT IS ORDERED** that the magistrate judge's first recommendation (R. 54) is adopted in part as stated herein; Clayton's motion to suppress statements (R. 44) is found moot, Coleman's motion to suppress statements (R. 28) is found moot, and Coleman's motion to suppress evidence from the Greendale apartment (R. 32) is held in abeyance.

**IT IS FURTHER ORDERED** that the magistrate judge's third recommendation (R. 97) is adopted; Clayton's motion to suppress/unlawful arrest (R. 41) is denied, Clayton's motion to suppress/unlawful traffic stop and vehicle search (R. 42) is granted, Clayton's motion to suppress/deficient warrant (R. 43) is denied, Coleman's motion to suppress/unlawful stop (R. 29) is denied, Coleman's motion to suppress/unlawful arrest (R. 30) is denied, and Coleman's motion to suppress/unlawful auto search (R. 31) is granted.

Dated at Milwaukee, Wisconsin, this 3rd day of May, 2022.

/s/ Lynn Adelman
LYNN ADELMAN
District Judge